WYANDOTTE & D. R. RY. v. KING BRIDGE CO.

(Circuit Court of Appeals, Sixth Circuit.  February 12, 1900.)

No. 611.

1. TRIAL—QUESTIONS FOR JURY.
    To authorize the submission of an issue of fact to the jury, there must be substantial evidence in support of the contention of the party having the burden of proof on such issue.

2. BRIDGES—CONTRACT FOR CONSTRUCTION—ERROR IN LOCATION.
    Under a contract by which plaintiff undertook to construct a bridge, complete, in accordance with certain plans and specifications, upon a public highway, and across a river which separated two townships,—the bridge to be paid for by the townships and a street-railroad company, in designated proportions,—it became the duty of the townships, having control of the highway, to designate the location for such bridge; and where, in doing so, their agent undertook to fix the location for the abutments, the plaintiff was entitled to recover from each of the other parties its pro rata share of the cost of extra work made necessary by reason of an error in such locations.

3. CONTRACTS—CONSTRUCTION.
    Where two townships and a street-railway company entered into a contract with each other by which they agreed to share in the cost of building a bridge on a highway, to be used jointly by the public and the railroad company, and to be built under the superintendence of an engineer to be jointly employed, and, in accordance with such agreement, they contracted with a fourth party to build such bridge, the two contracts are to be construed together; and although the latter contract is severally executed, each agreeing to pay a stipulated portion of the contract price, the enterprise is, in effect, joint, and a delay in the completion of the bridge beyond the

time fixed by the contract, caused by directions of the engineer employed, or by the authorities of the townships having control of the highway, cannot be made the basis of a claim for damages by the railroad company against the contractor.

4. SAME—PROVISION AGAINST EXTRA WORK.

A provision, in a contract for the building of a bridge in accordance with certain plans and specifications, that no extra labor or material shall be used or changes made in the plans, and no charge for extra work or materials shall be made, unless agreed to in writing, does not deprive the contractor of the right to recover for additional work or material furnished outside of the contract at the request of the other party, although not agreed upon in writing, or for extra labor or materials made necessary by an error on the part of the representative of such other party in locating the bridge, for which the contractor was not responsible.

In Error to the Circuit Court of the United States for the Eastern District of Michigan.

Lemuel H. Foster and Charles M. Swift, for plaintiff in error.
Michael Brennan, for defendant in error.

Before TAFT, LURTON, and DAY, Circuit Judges.

DAY, Circuit Judge. This case comes before this court on writ of error to reverse a judgment rendered in favor of the King Bridge Company against the railway company in the circuit court for the Eastern district of Michigan. It arises upon a contract entered into between the townships of Springwells and Ecorse, the bridge company, and the railway company. It appears that the townships of Springwells and Ecorse lie on opposite sides of the river Rouge, a small stream near the city of Detroit. Prior to making the contract which is the basis of the suit, this river had been spanned by a wooden bridge connecting the two townships. On the old bridge no provision had been made for a street railway. The townships, desiring to construct a new bridge, and the railway company, wishing to participate in the use and benefits to be derived therefrom, on January 11, 1896, entered into a contract in which the said townships of Springwells and Ecorse were respectively parties of the first and second parts, and the railway company the party of the third part. This contract is as follows:

"This agreement, made and entered into this 11th day of January, A. D. 1896, by and between the township of Springwells, in the county of Wayne, state of Michigan, party of the first part, the township of Ecorse, in said county and state, party of the second part, and the Wyandotte & Detroit River Railway, a corporation organized and existing under the laws of the state of Michigan, party of the third part, witnesseth: Whereas, the said several parties hereto are about to enter into a certain contract for the building of a bridge across the Rouge river on the River road, so called; said bridge to connect the said townships of Springwells and Ecorse; each of said townships to pay one-quarter of the cost of said bridge, and the said party of the third part to pay the remaining one-half of said bridge: Now, therefore, the said several parties hereto, in consideration of the premises, and of the contract now existing between the said township of Ecorse and said Wyandotte & Detroit River Railway in relation to the building, operation, and maintenance of said bridge, and of the franchise and rights upon the Springwells end of the bridge, which are hereinafter set forth, and in further consideration of the faithful performance of the covenants hereinafter contained to be performed on the part of the said party of the third part, do mutually covenant and agree as follows:

"(1) That the said bridge, when built, shall be thereafterwards, and during the period for which said Wyandotte & Detroit River Railway is now incorporated, operated, cared for, repaired, and maintained by the said several parties hereto in the following proportion, viz.: The said townships of Springwells and Ecorse shall each pay one-fourth of the expense of operating, caring for, repairing, and maintaining said bridge, and the said Wyandotte & Detroit River Railway, its successors and assigns, and any company or corporation succeeding to its corporate rights, shall pay one-half of the expense of operating, caring for, repairing, and maintaining said bridge.

"(2) The said Wyandotte & Detroit River Railway shall pay one-half of the cost and expense of procuring and setting up a proper dynamo, or other suitable machinery or engine for operating the draw of said bridge, and shall, in the event that the said bridge is operated by electricity, furnish the current for operating said draw.

"(3) Inasmuch as the party of the third part shall furnish the current to operate said bridge gratis, it shall have the power to employ the man or men to operate said draw, but the salary to be paid such man or men shall be such as is agreed upon between the several parties hereto. Said Wyandotte & Detroit River Railway shall pay one-half of all said salaries, and the said townships each one-quarter thereof.

"(4) The said bridge shall be a public bridge, and a part of the public highway. It shall be under the exclusive control of the townships of Springwells and Ecorse, and the proper officers thereof, as provided by law, in the same manner as if the said bridge were built by said townships without the assistance or co-operation of the said party of the third part: provided, however, that the party of the third part shall have the exclusive right of crossing said bridge with its cars during the term of which said party of the third part is now incorporated, and said party of the first and second parts hereby grant to said Wyandotte & Detroit River Railway the exclusive right to operate its line and cars across said bridge during the present corporate life of said Wyandotte & Detroit River Railway, unless said party of the third part, or its successors or assigns, shall cease to operate its cars for a period of six months across said bridge, but a failure to operate its said cars, caused by unavoidable accident, shall not be construed as authorizing the parties of the first and second parts to grant the right of crossing said bridge to others: and provided, further, that the cars of the connecting lines with which said third party may contract for through traffic may run its cars over said bridge with the consent of said party of the third part, but not otherwise: and provided, also, that if the said Wyandotte & Detroit River Railway shall renew its corporate existence, or shall, at or before the expiration of its corporate life, transfer its property rights to any other person or corporation, then the said Wyandotte & Detroit River Railway, or its successor or successors, or the person or corporation succeeding to its corporate rights, shall have the right, in common with other street-railway companies, to operate its line and cars across said bridge: and provided, further, that, after the expiration of the corporate life of said Wyandotte & Detroit River Railway, any person or corporation desiring to operate a line of cars across said bridge shall pay the said Wyandotte & Detroit River Railway, or to the person or corporation succeeding to its property rights, a proportionate part of the value of one-half of the said bridge, in the condition in which said bridge may then be. If the value of said bridge cannot be agreed upon, its value shall be determined by three arbitrators, who shall be capable and disinterested men, one of whom shall be chosen by each of the parties to the question; and the third by the two already chosen, and the determination of said arbitrators, or a majority of them, shall be binding.

"(5) From and after the completion of said bridge, the said Wyandotte & Detroit River Railway shall, by contract with its connecting line, insure the carriage of passengers from the center of said bridge to any point of said city of Detroit reached by its connecting lines, at the current rate of fare for the time being of said connecting line, and that from all points in the township of Ecorse the said Wyandotte & Detroit River Railway shall insure, by contract with its connecting line, the carriage of passengers to any point in Detroit reached by said connecting line, at a rate of fare not to exceed the

rates of fare in Ecorse prescribed by the franchise under which said third party is operating its line in Ecorse plus the current rate of fare for the time being charged by the connecting line.

"(6) The parties hereto shall employ a competent civil engineer to design and inspect the said bridge during the entire period of construction, at such rate of compensation as may be agreed upon by the said parties, such compensation to be paid by the said parties in the same proportion as is herein provided for the payment of the cost of said bridge.

"(7) When the present bridge is removed or closed to travel, and from that time until the new bridge shall be completed and opened for travel, the said parties hereto shall provide either a temporary bridge or a ferry across said Rouge river near the site of the present bridge; and the said third party shall pay one-half of the expenses thereof, including the expense of operating the same, and one-half the expense of removing the present bridge.

"(8) The said bridge or the approaches thereto shall be properly guarded by safety gates or other sufficient guards, and the cost of erecting, maintaining, and operating the same shall be borne one-fourth by each of the said townships of Springwells and Ecorse, and the remaining half by the said Wyandotte & Detroit River Railway."

The plans and specifications having been prepared, a contract was entered into between the said townships, the railway company, and the bridge company. This contract is as follows:

"This agreement, made and entered into this third day of March, A. D. 1896, by and between the King Bridge Company, a corporation organized and existing under the laws of Ohio, party of the first part, the township of Springwells, in the county of Wayne and state of Michigan, party of the second part, the township of Ecorse, in said county and state, party of the third part, and Wyandotte & Detroit River Railway, a corporation organized and existing under the laws of Michigan, party of the fourth part, witnesseth: That the said King Bridge Company, party of the first part, in consideration of the premises, and of the payment of nineteen thousand three hundred dollars as hereinafter set forth, doth hereby covenant and agree to and with said parties of the second, third, and fourth parts that it will build the substructure and superstructure of the iron and steel bridge complete in every particular, and strictly in accordance with the plans and specifications hereunto annexed, and made a part hereof, under the supervision and inspection of Charles C. Bothfeld, consulting engineer, and to the satisfaction of said Charles C. Bothfeld, the commissioners of highways of the townships of Springwells and Ecorse, and said Wyandotte & Detroit River Railway, including automatic safety gates at each approach to said bridge, and the removal of the present bridge, for the sum of nineteen thousand three hundred ($19,300) dollars, and that said bridge shall be completed and open for the public travel on or before the first day of July, A. D. 1896. Said parties of the second, third, and fourth parts do hereby covenant and agree to and with said party of the first part that they will pay for said bridge in the manner and proportion following: That is to say, said township of Springwells shall pay, as its proportion of the contract price of said bridge, the sum of four thousand eight hundred and twenty-five ($4,825) dollars and no more, and said sum shall constitute the limit of the liability of said township of Springwells under this contract. Said township shall pay said sum of four thousand eight hundred and twenty-five dollars ($4,825) in township orders, running not to exceed one and two years from the date thereof, with interest at six per cent. per annum. Said orders shall be issued with the condition contained therein that the said orders, or any of them, may be called in and paid by the said township of Springwells at any time. Said township of Ecorse shall pay, as its proportion of the contract price of said bridge, the sum of four thousand eight hundred and twenty-five dollars ($4,825), and no more, and said sum shall constitute the limit of the liability of said township of Ecorse under this contract. Said township of Ecorse shall pay said sum of four thousand eight hundred and twenty-five dollars ($4,825) in township orders running not to exceed one, two, and three years from the date thereof,

with interest at six per cent. per annum. Said orders shall be issued with a condition contained therein that the said orders, or any part of them, may be called in and paid by said township at any time. Said Wyandotte & Detroit River Railway Company shall pay, as its proportion of the contract price of said bridge, the sum of nine thousand six hundred and fifty dollars ($9,650), and no more, and said sum shall constitute the limit of the liability of said Wyandotte & Detroit River Railway Company under this contract. Said sum shall be paid in the manner and at the time hereinafter set forth. Said party of the first part shall do no extra work on said bridge, or any part thereof, and shall furnish no so-called extra material for said bridge, and shall make no changes or alterations in the plans, or deviate in any manner from the specifications, either in kind, quality, weight, or dimensions of material or parts, except upon the written agreement of said parties of the second, third, and fourth parts. No extra charge for labor or material caused by alteration or changes will be allowed or paid for unless a contract for the same with the cost thereof shall have been first reduced to writing, and signed by said parties of the second, third, and fourth parts. It is agreed and thoroughly understood that time is of the very essence of this contract, and that unless said party of the first part shall complete said bridge so that it shall be ready to be opened for travel on the first day of July, A. D. 1896, the said party of the first part shall forfeit the sum of fifty dollars per day for each day that shall elapse between the first day of July and the day upon which the said bridge shall be completed and ready to be opened for public travel, as liqui-dated damages for such delay, and the said parties of the second, third, and fourth parts may retain the same out of the final payment under this contract: Provided, however, that said party of the first part shall not be held respon-sible for strictly unavoidable delays, caused by the elements, mobs, enemies of the government, strikes of workingmen in the employ of the party of the first part, or acts of Providence. Payments in the proportions hereinbefore set forth shall be made upon said contract in monthly installments of 80 per cent., upon estimates certified by said Charles C. Bothfeld, upon accepted material delivered on the ground and in course of erection; and said parties of the second, third, and fourth parts shall pay their respective proportions of said eighty per cent. of said estimates in the manner hereinbefore pre-scribed, within five days after receiving notice of the amount of such estimate. The balance due upon said contract shall be paid by said parties of the second, third, and fourth parts, in the manner and proportions hereinbefore set forth, on the final completion and acceptance of the said bridge as herein specified. Said party of the first part further agrees that the material com-posing the present bridge shall remain the property of said second and third parties, and may be taken by them when the said bridge is removed by said first party."

On the 13th of August, 1896, the work being reported as completed, it was accepted by the supervising engineer, Mr. Bothfeld, and the re-spective boards and highway commissioners of the two townships. The railway company also laid tracks upon the bridge, and has used, and is continuing to use, the same. The railway company having failed to pay a balance upon the contract of $4,101.53, and also certain claims made by the bridge company, as shown in its bill of particulars filed in the case, this action was brought for the recovery thereof. The railway company set up the general issue, and further alleged that the labor was done and material furnished under a special con-tract, which contract the defendant fully set forth, and averred a breach of the contract on the part of the bridge company, in delaying the completion of the bridge from the 1st day of July, 1896 (the day stipulated for its completion), until the 1st day of September, 1896, to the damage of the railway company in the sum of $5,000, which sum, or so much thereof as will be sufficient for the purpose, said rail-way company demanded as recoupment against the demand of the

bridge company, and the balance thereof to be certified in its favor. A question of variance is made because of the alleged difference between the contract proven and the allegations of the declaration. We deem it sufficient to say that we find no error in the ruling of the circuit court upon this feature of the case.

Much of the controversy in the case arose, and a very considerable portion of the testimony was introduced, upon the issue raised as to the right of the bridge company to recover because of the settling of the center pier; it being the contention of the bridge company that it was caused by certain dredging near thereto, ordered by authority of the war department, for the proper construction and enlargement of the channel of the river. On the part of the railway company it was contended that this defect in the pier was not due to the dredging, or any other cause, except defective construction by the bridge company, and it introduced testimony tending to substantiate this defense. The character of this claim, and the correctness of the judge's charge on this point, may be considered in connection with the instruction given to the jury on that subject. The court charged the jury:

"The plaintiff's further claim is that with regard to these sums, aggregating $981.15, that is the share which the plaintiff claims he is entitled to for the said several matters which have been laid before you in regard to raising the bridge and leveling the track, caused by the damage to the center pier, raising the same by order of the engineer. The court instructs you that if you are satisfied with the evidence; and I will leave you to recall that, and give it the same consideration as you would to important affairs in your own business,—if you are satisfied that the settling of the pier, and the expense of restoring it to proper position in order to make the bridge an operative and good structure, which should reasonably satisfy the parties entitled to full performance of the contract, was caused by the dredging had under the order of the war department in the vicinity of the pier, and of the protection pier, and by no other cause, after the construction of that pier, and to be put in position of the center span of the bridge, and not due to any fault on the part of the plaintiff in the construction of the bridge, then that item should be allowed to the plaintiff. If, on the other hand, the bridge gave way or settled on that side in such a manner as to necessitate all this work that was done, and for which the plaintiff claims compensation, and was not in any manner caused by the dredging, there done pursuant to the order of the war department, but arose from the defective manner in which that part of the work was performed, then the plaintiff cannot recover for that. There is an implied warranty that the plans referred to in this contract and the specifications, which are, as the word imports, a more particular statement of the plan to guide the labor to be performed thereunder,—there is an implied engagement on the party who furnishes these plans, viz. the parties of the second, third, and fourth parts, the two townships and the railway company, that they should be fit and proper for the work to be done under them; and if that was the case, if they were fit and proper, and by the pursuing of them and adherence to their requirements this work could have been done, and should be done, by the plaintiff, then it was the duty of the plaintiff to closely adhere to those plans. If the plaintiff did so closely adhere to those plans in the work of construction, and, notwithstanding that, by this dredging in that vicinity, after he had erected pursuant to the plans, if he did so erect this center pier, the same was caused to settle, and necessitated this expense. I say to you, gentlemen of the jury, that in that case it is for you to say what sum the plaintiff should have; whether or not he is entitled to the sum of $521.50, as is now stated,—the cost of putting and repairing the damage caused by the settling of the center pier, and raising the same. And so, too, in regard to the repairing of the protection pier on account of its being thrown out of

shape by the jackscrews,—work performed by order of the engineer, as claimed in the bill of particulars; and there is evidence that it was ordered. This work, you will remember (to call your attention to the testimony), it is claimed by the plaintiff, was occasioned by the necessity of adjusting the bridge to its proper and true level, in order to make it an operative structure for the purposes for which it was designed, after the injury claimed to have been caused to it by the settlement of the pier, induced by the dredging; and as a part of that expense, really, and as a necessary consequence of that expense, they put the bridge over, and supplied the material necessary to its restoration to its proper level. The plaintiff claims $150 for that, and it is for you to say whether that amount is a just and fair amount, and, primarily, for you to determine whether or not the defendant ought to be charged with that amount under the evidence in the cause."

In considering this part of the charge, it will be observed that the court undertakes to permit the bridge company to recover, provided the settling of the pier was caused by the dredging which the testimony tends to show was undertaken, by order of the war department, by the townships, and paid for by the townships and railway company, and over which the bridge company had no control. We have carefully examined the record in this behalf, and while there is testimony tending to show that the war department did require the dredging to be done, and some testimony tending to show that the river was dredged within a few feet of the center pier, yet there is no testimony, which we have been able to discover, tending to show that the dredging caused the settling of the pier. Had this testimony been given, we think the court might then have submitted the matter to the jury in the manner stated in the portion of the charge above quoted. Certainly the bridge company could not be charged with delays from this dredging, nor made to suffer from the resulting damage, wholly without its fault. If the bridge company was, under such circumstances, directed by the engineer in charge to remedy the defect, as it introduced testimony to show that it was, it would have had the right to charge the necessary expense of this additional work to the other contracting parties for whom it was building the bridge. The testimony introduced by the railway company tends to show that the dredging did not interfere with the center pier, and that no earth was removed which supported it. There was also testimony indicating that the settling was caused by the tops of the piles having been sawed off unevenly. In the absence of testimony tending to establish that the dredging caused the settling of the pier, we think the court erred in submitting this proposition to the jury. The jury found for the plaintiff upon this claim, unsupported, as we have seen, by any substantial testimony in the case. The bridge company had undertaken to build the substructure and superstructure of the bridge complete; and, seeking to recover for work rendered necessary by the defect in the pier, the burden devolved upon it to establish a cause for this condition of affairs, not arising from defective construction or faulty workmanship on its part. This ruling might well dispose of the case, but, as the cause is to be retried, we deem it proper to indicate our opinion upon certain questions likely to arise in the new trial, and which have been thoroughly argued to the court.

A claim was made by the bridge company to recover because of

certain additional work required by the wrong location of the abutments, which, the testimony tends to show, were located by an engineer or surveyor employed by the townships for that purpose. It is said that one Brown, employed by the townships, was sent to do this work without the knowledge or consent of the railway company, and therefore it is not responsible for anything which Brown may have done in that behalf. Furthermore, it is claimed that the railway company and its associates in the contract were not obliged to furnish lines upon which the bridge should be constructed. We do not agree with this contention. It appears in the preliminary contract (which we think the court very properly admitted as bearing upon the relation of the parties, and the scope of the agreement between them) that the bridge, when completed, should be a public bridge, and a part of the public highway, and should be under the exclusive control of the townships of Springwells and Ecorse, and the proper officers thereof. True, the bridge company agreed to build the substructure and superstructure of the bridge complete in every particular, and in accordance with the plans and specifications, under the supervision of the consulting engineer. But it was not within its province to locate the bridge which was to become a part of the public highway, subject to the control of the public authorities. It was within the province and duty of the latter to locate this part of the highway, and it was equally the duty of the bridge company to adopt the location thus pointed out. Upon this proposition the court charged (and, we think, properly charged) the jury:

"The obligation of these defendants towards the plaintiff with regard to the location of that bridge was, as you can see, an important one. They were to designate the location of the bridge. The plaintiff could not enter upon this construction, or could not put this bridge up on the Rouge river, unless the place was designated; and if the defendants took upon themselves the duty of placing these abutments, and requiring the plaintiff to accept this as the designation of the bridge, and by reason of any error committed by the defendants or their agent, or the person whom they employed for that purpose, this work was rendered necessary, and if you are satisfied under the evidence that it was reasonably worth the sum of $350, and was caused, not by any fault of the plaintiff, but by the fault of those whose duty it was to designate the place of the abutments, then you may allow that sum."

The two items we have considered together made up the principal amount of the bridge company's claim for compensation outside of the contract.

It is further contended by the railway company that it is entitled to recover the stipulated sum for delay in the completion of the bridge, notwithstanding the delay may have been caused by the consent or action of the township authorities, or the failure of the surveyor to indicate a proper location of the abutments of the bridge, or because of the additional work rendered necessary by the settling of the center pier caused by dredging. We do not agree with this contention, except in so far as we have already pointed out that there was no testimony in the case tending to show that the central pier had settled because of the dredging of the river. We think the court below ruled correctly in admitting the preliminary contract

of January 11, 1896, to be considered with the contract under which the work was done. These documents should be construed together, with a view to ascertaining the purpose and intent of the parties. The preliminary contract undertakes to procure the erection of a bridge, and contracts for the supervision of an engineer in erecting the structure, in which all are jointly interested. The second contract undertakes to make the contract several, in apportioning the sums to be paid for labor and material; otherwise, the enterprise is of a joint character. The railway company, it appears, took but little active part in the construction of this bridge. It was contented to allow the supervising engineer to look after and conduct the work in connection with the township boards. The structure, as we have said, was to be a single structure, in which all were interested. We think the bridge company might well rely upon directions given within the scope of his authority by the engineer, as well as like directions of the members of the township boards acting in good faith in the construction of the work,—not to change the terms of the written contract, but as directing matters essential to the construction of the bridge, not specifically covered by the terms of the written agreement. We do not think the railway company has any right to charge the bridge company with delay which the testimony may show was caused by the direction and request of the township officers, or by their failure to furnish lines for the proper construction of the bridge. King Iron Bridge & Mfg. Co. v. City of St. Louis (C. C.) 43 Fed. 768, 10 L. R. A. 826; White v. School Dist., 159 Pa. St. 201, 28 Atl. 136; Blanchard v. Inhabitants of Blackstone, 102 Mass. 343.

It is further contended by the railway company that the charges for additional compensation are "extras," within the terms of the contract, which provides as follows:

"Said party of the first part shall do no extra work on said bridge, or any part thereof, and shall furnish no so-called extra material for said bridge, and shall make no changes or alterations in the plans, or deviate in any manner from the specifications, either in kind, quality, weight, or dimensions of material or parts, except upon the written agreement of said parties of the second, third, and fourth parts." "No extra charge for labor or material caused by alteration or changes will be allowed or paid for, unless a contract for the same, with the cost thereof, shall have been first reduced to writing, and signed by said parties of the second, third, and fourth parts."

We do not construe these clauses to mean that there could not arise in the course of the construction of the bridge, and the carrying out of the manifest purpose of the parties to secure a suitable structure, a necessity for additional work not covered by the stipulations of the written agreement, and for which a liability would arise without further written contract. The purpose of this agreement, as we understand it, is to prevent any changes and alterations in the plans and specifications as set forth in the contract, and any claim for additional work or extra material in the construction of the bridge within the terms of the contract. The matters which we have referred to, the work necessitated by the settling of the pier, the wrong location of the abutments, which it was the duty of the authorities to properly locate for the bridge company, are en-

tirely outside of the contract, not within the scope thereof, or in the contemplation of the parties when the contract was signed. They are not within the class of "extras" which it was the intention of the parties to prohibit unless provided for in writing. The effect of this stipulation was to say to the bridge company:

"For the bridge as specified, of the materials, character, and dimensions written, we are willing to pay so much, and no more. For alterations or additions in the work contracted for, no additional payment shall be made, except as authorized by a written contract, duly signed by the parties."

It did not contemplate that the bridge company could not recover because of work required by the engineer, or by the other contracting parties, entirely outside the contract, but essential to the construction of the bridge, and arising from causes for which the bridge company was not responsible. We think this view is supported in Bridge Co. v. McGrath, 134 U. S. 271, 10 Sup. Ct. 730, 33 L. Ed. 934, and Wood v. City of Ft. Wayne, 119 U. S. 312, 7 Sup. Ct. 219, 30 L. Ed. 416. In the latter case the contract was for furnishing and laying water pipes. After the contract was made, the plans were changed so as to cross the river at another street, and the contractor was ordered to make a crossing there. The contractor declined to go on with the work unless paid for the extra additional cost of the new crossing. The trustees requested that no claim for extra work be made; insisted that the work should proceed, promising that in the future they would make it all right. The crossing was made as directed, and a claim for the extra expenses presented. The contract provided that no claims for extra work should be made or entertained unless done in obedience to a written order of the engineer or trustees. The court says:

"The latter work may be, in one sense, extra work; but if it results from an alteration of plan by the trustees, and there is, in consequence, an increase in the quantity of the work, the actual increase is to be paid for at the contract rate for work of its class."

Cunningham v. Baptist Church, 159 Pa. St. 620, 28 Atl. 490; Cook Co. v. Harms, 108 Ill. 157. The latter is a full and instructive case upon the point.

We think, therefore, that the court did not err, except in the particular already stated, in submitting these claims to the jury, notwithstanding there was no new contract in writing signed by the railway company.

A great number of objections and exceptions were taken at the trial to the admission of testimony. Many that may not arise upon a new trial. It is unnecessary to review them here. We think it was competent to show acceptance of the work by the township officers and the consulting engineer. We do not perceive how it was competent to show that the townships had settled with the bridge company, and allowed the demands which the railway company refused to pay, although we would not be prepared to say that this would be so prejudicial as to require a reversal. Some testimony was introduced, immaterial in its character, and not affecting the substantial rights of the parties. We think we have said enough to indicate the line of testimony which will be competent in

a new trial of the case. For error in permitting a recovery because of work rendered necessary by the settling of the pier, without testimony tending to support that demand, as we have undertaken to point out, the judgment is reversed, and a new trial awarded.