## WALSH CONST. CO. v. CITY OF CLEVELAND et al.

(District Court, N. D. Ohio, E. D. November 12, 1920.)

No. 9406.

1. **Equity ⚖️409—Master's findings of fact after jury is waived are binding, if supported by evidence.**

    Where a jury is waived and the issues referred to a master by consent of the parties, under authority of Rev. St. § 649 (Comp. St. § 1587), findings of fact by the master are conclusive on exceptions to report, unless not supported by substantial evidence.

2. **Municipal corporations ⚖️868(3)—Requirement of certificate that fund is available before contract is valid does not apply to contract not payable from general taxation.**

    The provisions of Cleveland Charter, §§ 122, 123, and 125, requiring the director of finance to certify funds are available before a contract is valid, which are substantial counterparts of Gen. Code Ohio, §§ 3806, 3797, 3807, except that section 123 of the charter describes the sources from which the anticipated funds are to be derived with greater particularity than the General Code, which, however, includes them in the expression "all other sources of revenue," are to be given the construction which had previously been given to the sections of the statute, and so construed do not require a certificate from the director of finance that funds are available for the completion of a contract unless the contract price was to be paid from revenues raised by general taxation.

3. **Statutes ⚖️226—Adoption or re-enactment of law of another state includes prior construction as part of it.**

    When a lawmaking body either re-enacts a statute or adopts a statute made by another state which the courts have previously given a definite construction, the construction is likewise adopted as part of the new law.

4. **Statutes ⚖️231—Sections of revision or codification given same construction as received before.**

    New sections in revision or codification of statutes should receive the same construction after revision or codification as they had received theretofore.

⚖️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

5. **Municipal corporations ⬳868(3)—Inadequacy of certified funds does not invalidate contract on unit basis.**

The fact that the funds available, as certified by the director of finance for the work under a municipal contract on the unit basis, proved to be insufficient for the completion of the contract, does not invalidate the contract, since to so hold would prevent the making of unit contracts by cities where the amount of the work cannot be accurately foreseen, and would render invalid a contract which was valid at the time it was entered into.

6. **Municipal corporations ⬳363—Contractor not liable for defects due to plan.**

A contractor, who constructed a city reservoir in accordance with plans and specifications prepared by the city, is not liable for the insufficiency of the work for the purpose intended, due to defects in the plan in view of the character of the soil on the site selected by the city.

7. **Municipal corporations ⬳359—Performance in good faith is substantial notwithstanding deviations from plan.**

If the contractor performs in good faith and without intentional violation of his contract, mere deviation from the plans does not prevent his recovery from the city on the theory of substantial performance.

8. **Municipal corporations ⬳374(2)—Arbitrary refusal of engineer to accept substantial performance does not prevent recovery by contractor for substantial performance.**

Where a contract with the city was substantially performed by the contractor, the refusal of the engineer to accept the work, even when such acceptance is made a condition precedent to the contractor's right to recovery, is unreasonable and arbitrary and does not bar recovery.

9. **Municipal corporations ⬳375—Reconstruction necessitated by faulty plans does not entitle city to recover all money paid contractor, because of slight defects in work.**

Where the reconstruction of a city reservoir on different plans was made necessary by defects in the plans prepared by the city and the slight amount of defective work by the contractor could have been replaced with little expenditure if the plans had been proper, the city is not entitled to recover from the contractor the entire amount paid for the reservoir.

10. **Contracts ⬳320—Measure of recovery for defective work stated.**

Where the contractor has substantially performed his contract but defective materials or faulty workmanship have entered into the work, the contractor is entitled to recover the contract price diminished either by the difference between the value of the building to the owner in its defective condition, and its value if perfectly constructed, if it is neither fair nor reasonably practicable to remedy the defects, or by the reasonable cost of remedying the defects where that is practicable.

11. **Municipal corporations ⬳375—Cost of repairing defective work held not measure of damages where structure was worthless.**

Where a contractor for the construction of a city reservoir substantially performed his work with slight defects of workmanship therein, but because of the defective plans prepared by the city the reservoir, if completed in accordance with the plans or if the defective work had been repaired, would have been worthless, so that the city elected to rebuild on a different plan, the city cannot recover from the contractor the amount it would have cost to repair the defective work.

12. **Municipal corporations ⬳375—City allowed to recover from contractor amount paid for defective work.**

Where a city reservoir had to be reconstructed on different plans after substantial completion of the original contract because of defects in the plans prepared by the city, the city can recover from the contractor for the defective work incorporated in the reservoir as originally constructed only the amount paid for such work as was defective on the basis of the contract price.

---

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**13. Damages ⟨⟩80(2)—Stipulated damages for delay in completion of work held properly allowed.**

    A contract for the construction of a city reservoir of large size is of a kind in which liquidated damages may properly be stipulated for, and a stipulation of $50 as liquidated damages for each day's delay in completion of the work is not so unreasonable as to be void as for a penalty.

At Law. Action by the Walsh Construction Company against the City of Cleveland, in which the defendant City had the National Surety Company made a party defendant. On exceptions to the master's report. Judgment entered for plaintiff.

Klein & Harris, of Cleveland, Ohio, for plaintiff.

Tolles, Hogsett, Ginn & Morley, of Cleveland, Ohio, and Alfred Clum, City Sol., of Cleveland, Ohio, for defendant city of Cleveland.

WESTENHAVER, District Judge. This action was brought originally against the city of Cleveland alone to recover a balance alleged to be due on a contract for constructing a clear water reservoir, upon a unit price basis and certain additional items of extra compensation. The city of Cleveland obtained an order making also a defendant the National Surety Company, surety on plaintiff's performance bond. See Walsh Construction Co. v. City of Cleveland (D. C.) 250 Fed. 137. The city thereafter filed an answer and also a cross-petition, seeking to recover judgment against the plaintiff and its surety for damages alleged to be due for defective work in building the reservoir. After the issues were made up, all parties, by consent, waived the right to a trial by jury, and by like consent the issues were referred to Robert L. Hoffman as special master to hear and decide the cause and all issues arising therein, with instructions to report separately his findings of fact and conclusions of law. His report having been made, certain exceptions thereto have been taken by the several parties, and the cause is now before me for decision upon the report and exceptions.

[1] A preliminary question is raised as to the legal force and effect of the master's findings of fact, which it is necessary first to determine in order to settle the scope of the inquiry arising upon these exceptions. Section 649, Rev. St. of U. S. (section 1587, U. S. Comp. St. 1916), authorizes the trial and determination by the court of issues of fact in civil cases whenever the parties waive a jury in writing, and provides that the finding of the court upon the facts, which may be either general or special, shall have the same effect as the verdict of a jury. When a jury is waived, the court may, by like consent, refer the issues to a master, with instructions to hear and determine the issues and to make findings of fact and conclusions of law. Whenever findings of fact are thus made, either by the court or by the special master, these findings can be reviewed only on exception for errors of law. Kimberly v. Arms, 129 U. S. 512, 9 Sup. Ct. 355, 32 L. Ed. 764. Such seems also to be the law of Ohio. See sections 11470–11480, G. C. The master's conclusions of law are consequently always subject to review, but his findings of fact, whether general or special, if supported by substantial

evidence, are as binding upon the court as is the finding of a jury. Hence, in considering the present exceptions, the scope of our inquiry is limited to whether or not the master's findings respond to and are supported by the pleadings; whether the findings of fact as made support the conclusions of law; whether the findings of fact are supported by substantial evidence; and whether or not the conclusions of law are correct. A master's findings of fact become a question of law only when not supported by substantial evidence. See Tilghman v. Proctor, 125 U. S. 136, 149, 8 Sup. Ct. 894, 31 L. Ed. 664; Kimberly v. Arms, 129 U. S. 512, 9 Sup. Ct. 355, 32 L. Ed. 764; Davis v. Schwartz, 155 U. S. 631, 636, 15 Sup. Ct. 237, 39 L. Ed. 289; Adamson v. Gilliland, 242 U. S. 350, 353, 37 Sup. Ct. 169, 61 L. Ed. 356.

Plaintiff has taken ten exceptions to the master's report, all of which purport to except to the master's conclusions of law; his findings of fact being accepted as conclusive. The city has taken two sets of exceptions, and the surety company has joined in the city's exceptions, and in addition thereto has taken an additional exception to the master's ruling that the surety is not discharged by reason of the changes and alterations made without its consent in the plans and specifications during the progress of performance. These several exceptions need not now be fully stated, but will sufficiently appear in the course of this opinion. Many of them raise the same question of law, and depend upon certain general legal principles. The most important questions thus raised are the following: (1) The legal force and effect of the exhaustion by previous payments of the amount certified by the city director of finance at the time the contract was made. (2) Whether the contract was substantially performed, and whether the refusal of the director of public utilities to accept was arbitrary and unreasonable, so that the plaintiff might recover if there had been a sufficient certification of funds. (3) The true measure of damages for faulty workmanship, and the amount of such damages. (4) The city's right to recover liquidated damages at the stipulated rate for plaintiff's delay in performance. (5) Whether on the facts as found, plaintiff is entitled to recover the amounts found due by the master on its third and fourth causes of action.

1. The contract is dated March 29, 1915, and the city director of finance certified thereon that there was the sum of $272,636 in the city treasury to the credit of the fund and not appropriated for any other purpose, from which payment to the contractor was to be made. The contract was for furnishing materials and performing labor in constructing a clear water reservoir as a part of a filtration plant for the city of Cleveland. This reservoir was approximately 1,000 feet long by 200 feet wide, divided into 2 basins, known as No. 1 and No. 2, covered by a concrete roof supported by side walls and 600 columns approximately 22 feet in height, with cross-walls and baffle walls. The contract was upon a unit basis, consisting of 21 separate items, of which 6 only were for lump sums, aggregating $15,900. The remaining 15 called for general excavation per cubic yard, excavation for back-filling per cubic yard, rolling foundations and embankments per ton mile,

concrete in foundations per cubic yard, concrete in solid walls in conduit sections and in piers and vaulting per cubic yard, steel reinforcement per pound, furnishing and placing special castings, furnishing and placing iron castings, furnishing and placing wrought iron, steel, and pipe, furnishing and placing cast-iron pipes, all per ton, brick masonry per cubic yard, furnishing and placing three-inch tile drains and twelve-inch drain pipe, per linear foot. The quantities of each class of work thus to be done upon a unit basis were approximate only and were given as a uniform basis for the comparison of bids. The city also reserved the right to increase or decrease the amount of any class or portion of the work as might from time to time be deemed necessary. The amount certified represents the price per unit bid by the plaintiff on the basis of this approximate estimate.

The master finds that the plaintiff had performed labor and furnished materials upon this unit basis in the amount of $301,739.40, extra work under the second cause of action $7,444.39, extra work under the fifth cause of action $793.58, and extra work under the sixth cause of action $1,090.04, aggregating $311,067.41. Of this amount, he finds that the city had paid during the progress of performance the sum of $272,188.20, and that the funds certified were wholly exhausted November 15, 1915. His conclusion of law is that notwithstanding the contract may have been fully performed, and the refusal to accept would be arbitrary and unreasonable, the plaintiff cannot recover because of the charter provisions of the city of Cleveland relating to the making of municipal contracts, and particularly that provision relating to the certificate of the director of finance.

[2] The city of Cleveland, prior to the making of this contract, had adopted what is known as a "Home Rule Charter." Under the heading "Department of Finance" are three sections, 122, 123, and 125, which are relied on as sustaining the master's conclusion. Section 122 provides, in substance, that no contract shall be entered into or authorized unless the director of finance shall first certify that the money required for such contract is in the treasury to the credit of the fund from which it is to be drawn, and not appropriated for any other purpose. Section 123 provides what shall be deemed to be moneys in the treasury to the credit of a fund and subject to certification. Moneys in the treasury are therein declared to include, not merely money actually in the treasury at the time, but money that is expected to come into the treasury before the maturity of the contract, whether from taxes or assessments, or from sales of services, products or by-products, or from any city undertakings, fees, charges, accounts, bills receivable, or other credits in process of collection, and the proceeds to be derived from bonds lawfully authorized to be sold and in process of delivery. Section 125 provides, in substance, that all contracts adopted contrary to the provisions of the preceding sections shall be void, and that no person shall have any claim against the city thereunder, nor shall the council or any officer of the city waive or qualify the limits fixed by any ordinance, resolution, or order, as provided in section 122, or fasten upon the city any liability whatever in excess of such limits. These sec-

271 F.—45

tions are appropriated bodily from the General Code of Ohio, and have been in force for many years. Section 122 is the exact counterpart of section 3806, G. C. Section 123 is the substantial equivalent of section 3810, especially when that section is supplemented by section 3797, G. C. Section 123 combines the provisions of these two sections of the General Code and resorts to greater particularity in describing the sources from which funds that may be anticipated are to be derived. In section 3797, G. C., "all other sources of revenue" is the expression used; but, obviously, it is broad enough to include all the sources of revenue specifically mentioned in section 123. ·Section 125 is the exact counterpart of section 3807, G. C. The framers of the municipal charter in readopting these sections, G. C., inverted the order of two of them and made some changes in phraseology, the most material of which is the plural form of the word "section" in section 125, instead of the singular form in section 3807.

[3, 4] Considering the sections as a whole, the subheading under which they are found in the municipal charter, the purpose to be subserved by their re-enactment, and comparing them with the corresponding sections of the G. C. of Ohio, it seems obvious to me that no change in the law was intended, and that no new limitations or restrictions are placed on the contracting power of the city. A change in the law, especially a change so fundamental, is not to be inferred merely from a change in the order of the sections or from changes of language which appear to have been made only to fit the sections to a different scheme of organization and administration. This conclusion is supported by certain well-settled rules of statutory construction. Thus, when a lawmaking body either re-enacts a statute or adopts a statute made by another state, to which the courts have previously given a definite and settled construction, it is uniformly held that the construction thus given by the courts is likewise adopted as a part of the new law. Willis v. Eastern Trust & Banking Co., 169 U. S. 295, 18 Sup. Ct. 347, 42 L. Ed. 752; Endlich, Interpretation of Statutes, § 371; Gale v. Priddy, 66 Ohio St. 400, 64 N. E. 437. Also new sections in a revision or codification of statutes should receive the same construction after revision or codification as they had received before the revision or codification, unless a contrary intent is made to appear with reasonable clearness. Williams v. State, 35 Ohio St. 175; State v. Toney, 81 Ohio St. 130, 90 N. E. 142, 18 Ann. Cas. 395.

These sections of the General Code had, previous to their re-enactment in the municipal charter, received in Ohio a definite and well-settled construction. They were held to apply only in those cases in which a contract was to be paid from revenues raised by general taxation, and not to contracts which were to be paid from the proceeds of bonds lawfully issued, or other revenues of self-sustaining public utilities. In the cases last mentioned, a certificate is held not to be an essential condition precedent to a valid and binding contract. Kerr v. Bellefontain, 59 Ohio St. 446, 52 N. E. 1024; Comstock v. Nelsonville, 61 Ohio St. 288, 56 N. E. 15; Emmert v. Elyria, 74 Ohio St. 185, 78 N. E. 269; Akron v. Dobson, 81 Ohio St. 66, 90 N. E. 123; Frisbie v. East Cleveland, 98

Ohio St. 266, 271, 120 N. E. 309. In the present case, the improvement was to be paid for wholly from bond issues, the interest and sinking fund of which were to be provided from the revenues of a profitable and self-sustaining public utility. My conclusion is that the charter provisions in question must receive the same construction as the corresponding provisions of the General Code, and that the contract is not invalid because the funds certified proved to be insufficient.

[5] This conclusion is supported by other considerations. These sections of the municipal charter must be construed in connection with other provisions of the law which confer full and ample power upon the city to enter into contracts of this character, and should not be given a construction which would seriously impair, if not largely destroy, the city's power to contract. In making a contract upon a unit basis, especially one of this magnitude, it is impossible to do more than to make an approximate estimate, and this is what was done. It was expected and contemplated that these quantities might be exceeded. Likewise in a work of this character and magnitude, unforeseen conditions will arise during performance which make necessary changes and alterations in the plans in order to accomplish the main object and purpose of the contract. This also, the contract evidences, was contemplated by the parties. and provision is made therein for changing and altering the plans during performance and for extra work, the necessity for which it was expected would arise, but the nature and extent of which could not be determined in advance. If the master's conclusion is sustained, the city's power to make a contract upon a unit basis would be utterly destroyed.

Moreover, a contract if valid at all is valid when made and does not become invalid as a result of contingencies arising during the performance. The sections in question are directed primarily to the making of a valid contract, and do not contemplate that a valid contract may be terminated during performance because the funds then certified prove to be inadequate. It is no answer to say that if, in the course of performance, it appears that the funds certified will be or have been exhausted, the city can or should appropriate additional funds and furnish a supplementary certificate. The city's power so to do implies a like power to refuse so to do. New officials may then be in office. Both parties are equally at liberty to refuse to perform further. In any event, a contractor would be.faced with the necessity of suspending performance, and perhaps abandoning the work, and then be confronted with the proposition that he could recover nothing because the contract had not been substantially performed. Obviously the proper construction of these sections, whenever applicable, must be one which will permit a valid contract to be made and will enable both parties to determine at the time of making it whether or not the contract is a valid one and susceptible of full performance. It is either valid at that time or it is invalid; if valid when made, it binds both parties until fully performed; it does not become invalid because of the failure to estimate correctly in advance the amount necessary to be certified. 'Granting the parties act in good faith and that the contract as made is free from fraud,

it seems to me that a contract upon a unit basis does not become invalid, and the contractor is not excused from performance nor barred from recovery because the amount estimated as necessary and duly certified, as is required, prove subsequently to be insufficient. In that situation, if the contractor has performed, he may have a judgment for the excess, but is remitted to the remedies provided by law for obtaining payment of a judgment against a municipal corporation.

2. The master finds that the contract was substantially performed in January, 1916; that the contractor was entitled to have a formal acceptance within a reasonable time thereafter, as provided in the contract, and that any refusal so to accept was unreasonable and arbitrary. This finding, it is not contended, is not supported by substantial evidence; but the city's contention, as I understand it, is that these findings are nullified and overthrown by certain other findings which show conclusively that the contract was not in fact substantially performed, and that hence no recovery can be had. This contention is raised by several exceptions.

The master's findings are very full and definite. He properly separates his findings of fact from his conclusions of law. It is not necessary to summarize or state them fully, but it will be sufficient merely to refer to such as are necessary to a disposition of this contention.

On January, 1916, the work called for by this contract was fully performed and acceptance of it was demanded in writing. All the work had been done under the supervision and direction of the city's engineer. It was subject to inspection and was, in fact, inspected during the entire course of performance. After its completion, a final estimate was prepared by the city engineer preliminary to a final acceptance by the director of public utilities, and certain meetings were held with the director in the early part of 1916, at which a final acceptance was the subject of discussion. The only questions then in dispute related to the contractor's claim for extra compensation, as is now claimed by him in some of the causes of action. The amended petition alleges, and the answer admits, that the engineer had made a final estimate; but, while it is claimed that the director of public utilities had in fact verbally accepted the work, no formal written acceptance by him had been given at the time the events happened out of which this controversy has arisen. The master's findings are not that there was an acceptance by the director, but that he should have accepted and his refusal so to do was unreasonable and arbitrary.

On July 9, 1916, a portion of the reservoir, consisting of four columns, together with part of the reservoir roof, collapsed. The fallen part of the roof consisted of four panels, comprising a total area only of about 31½ square feet, which had been supported by the four columns. An examination disclosed that the collapse of the columns was due to defective concrete. This led to an extensive examination and inspection by numerous experts, which continued during a period of many months. Demand was made upon the plaintiff, under paragraph AA of the contract, to make repairs, and upon his failure so to do the city entered into a contract with John F. Casey Company for a recon-

struction of the reservoir such as was deemed necessary to place it in proper condition to serve its purpose. The amount expended on this new contract is $326,377.35, and is made the basis of the city's second cause of action in its cross-petition.

This reconstruction plan, pursuant to which the Casey Company did the reconstruction work, was of an entirely different design from that of the original construction, and different from that according to which the plaintiff had been ordered to make repairs. It did not consist merely of the replacement of defective work or repairing parts of the original structure, but provided for the surrounding of each column with a concrete shell or jacket, and further provided for the placing of steel reinforced concrete inside of the lining at the bottom and sides of the reservoir and steel reinforced concrete covering the outside of the roof of the reservoir. All this construction was tied together by heavy steel concrete reinforcement.

The necessity for this plan of reconstruction, the master finds, was, due to defects in the original design, and not to faulty work or defective materials. The effect of it was not merely to remedy or repair such faulty workmanship or defective material, but to remedy and overcome the defects in the original design. The walls of the original structure, as designed, were of the gravity type, relying upon their weight and shape for the strength required to resist the pressure of the outside surface and pressure of the water from within. The bottom and top were to be made of a large number of units, not tied together by steel and not having special construction to insure equal settlement of the structure or uniform loading upon the foundation soil. A reservoir of this type, the master finds, required a firm, unyielding foundation so that no unequal settlement or movement could take place. It was designed upon the assumption that a suitable soil would be encountered for the foundation. In brief, his finding is that the failure of the reservoir as originally constructed, and the necessity for the plan of reconstruction such as was adopted, was due to the nature and character of the original plans and specifications, for which the city, and not the contractor, was responsible. The only faulty workmanship of the contractor, the master finds, was due immediately to the use of excess water in the mixing of the concrete and to the use of a special kind of concrete mixer employed upon a part of the work; in fact, that substantially all the defects were those of workmanship, and not of materials. He further finds that the plaintiff showed at all times a willingness to comply with instructions; that it committed no serious breaches of the contract intentionally; that it did not willfully violate the specifications or depart therefrom to any extent except as was done with the knowledge of the city's engineers or inspectors; that the entire structure grew step by step from foundation to completion under city supervision; that each part of it, with the exception of the columns, was susceptible to examination and criticism before the portion resting upon it was placed. The faulty workmanship, he finds, was not large, but was present only in 2042.7 cubic yards of the concrete, the contract price of which on a unit basis amounted only to $14,635.68.

[6] If the master is correct in his view of the law that the contractor is responsible only for the faulty workmanship thus found, and not for the failure of the structure due to defects in the original design, then it seems to me that his conclusion that the contractor had substantially performed his contract, and that a refusal to accept would be unreasonable and arbitrary, is fully sustained by the evidence and is not overthrown by his specific findings of fact. No doubt is entertained by me that the theory of the law adopted by him is the correct one. The site was selected by the city. The plans and specifications were designed and prepared by the city. The entire design of the reservoir was prepared by the city. The contractor was bound to furnish materials and perform labor only in constructing a reservoir of that design and upon that site, without any power to modify the designs or plans to meet unexpected conditions. If the contractor should undertake so to do in order to produce a better structure, such, for instance, as providing pile foundations or making the concrete bottom or walls of additional thickness, the work would have been wholly outside of his contract and contrary to the plans and specifications. The contractor, neither expressly nor impliedly, guaranteed or warranted that a reservoir constructed on that site and according to the design and plans would answer the purpose for which it was intended. The city or its officials could make changes, if any were deemed necessary to correct the faults of the design; but the contractor was not at liberty so to do. The contractor was bound to build as had been agreed and as he was from time to time directed. (The contractor here is not in the position of one who undertakes to construct a building or to produce a given result and has free choice of the means whereby that result may be accomplished. In cases of this character it is settled law that if a contractor performs his contract according to the plans and specifications, he is not responsible for the failure of the structure because of faulty design, or because the structure as designed and built will not answer the purpose for which it was intended. The law in this respect is so well settled, and has been so often stated, that it will be sufficient to refer to some of the most pertinent authorities. Filbert v. Philadelphia, 181 Pa. 530, 37 Atl. 545; Harlow v. Homestead, 194 Pa. 57, 45 Atl. 87; MacKnight Flintic Co. v. New York, 160 N. Y. 72, 54 N. E. 661; Schliess v. Grand Rapids, 131 Mich. 52, 90 N. W. 700; Conway Co. v. Chicago, 274 Ill. 369, 113 N. E. 703; Penn Bridge Co. v. New Orleans (5 C. C. A.) 222 Fed. 737, 138 C. C. A. 191; Huetter v. Warehouse Realty Co., 81 Wash. 331, 142 Pac. 675, L. R. A. 1915C, 671; Sutherland on Damages, § 701.

The cases most strongly relied upon by the city are the following: Trustees of Trenton v. Bennett, 27 N. J. Law, 513, 72 Am. Dec. 373; Dermott v. Jones, 2 Wall. 1, 17 L. Ed. 762; Creamery Package Co. v. Russell, 84 Vt. 80, 78 Atl. 718, 32 L. R. A. (N. S.) 135; Day v. U. S., 245 U. S. 159, 38 Sup. Ct. 57, 62 L. Ed. 219. All these cases belong to an entirely different class, and relate to contracts in which there is an absolute undertaking to do a particular thing or to insure a given result, or where the loss or failure is due to accident during the progress of

performance. They are sufficiently distinguished by the authorities already cited.

[7] This being the law, the master was plainly right in holding that the contract was substantially performed and that the plaintiff is not barred from recovery because of faulty workmanship of the kind and extent found by him. It is settled law that if a contractor performs in good faith, is guilty of no intentional violation of his contract, but has merely deviated from the plans, or was not guilty of allowing defective materials or faulty workmanship to creep in during performance, he is entitled to recover upon the theory of substantial performance. See Goldsmith v. Hand, 26 Ohio St. 101; Ashley v. Henahan, 56 Ohio St. 559, 47 N. E. 573; Nolan v. Whitney, 88 N. Y. 648; City of Elizabeth v. Fitzgerald (3 C. C. A.) 114 Fed. 547, 52 C. C. A. 321; Mac-Knight Flintic Co. v. New York, 160 N. Y. 72, 54 N. E. 661; and other cases above cited.

[8] It is also settled that if a contract is substantially performed, a refusal of the engineer or architect to accept, even when such acceptance is made a condition precedent to the contractor's right to recovery, is unreasonable and arbitrary, and will not bar recovery. See City of Elizabeth v. Fitzgerald (3 C. C. A.) 114 Fed. 547, 52 C. C. A. 321; Schliess v. Grand Rapids, 131 Mich. 52, 90 N. W. 700; Ashley v. Henahan, 56 Ohio St. 559, 47 N. E. 573.

3. The measure of damages adopted by the master for the faulty work done by plaintiff, and the amount of such damages, are also challenged by the city. The master finds that it would have been necessary to expend the sum of $56,350 to have removed the faulty concrete and to have replaced it with sound concrete. He makes no finding as to the difference in value between what would have been the value of the reservoir if constructed without this faulty work, and its value with the faulty work. His conclusion is that inasmuch as the sum of $56,350 was not expended in remedying the faulty work, the true measure of damages under all the circumstances is the amount paid by the city to the contractor for that part of the work which was defective, amounting to the sum of $14,635.68, and in addition thereto, the sum of $346.40, for replacing the collapsed portion of the reservoir. Plaintiff does not except to the master's finding or conclusions in this respect, and upon this hearing announced a willingness to accept and stand thereon.

The city's cross-petition is framed on the theory that it has the right to recover the amount paid to the John F. Casey Company on the reconstruction contract. This, obviously, could be true only on the view that the contractor undertook to construct and deliver in completed condition a reservoir suitable and fit to answer the desired purpose. As already said, this view of the contract and of the law is not sustainable. Treating, however, the city's cross-petition as adequate to justify a recovery of damages upon any proper measure due to faulty workmanship, the question arises as to what, under all the circumstances, is the proper measure of damages.

[9] In some cases, where the structure is a total loss, due to the defective materials or faulty workmanship of the contractor, and the own-

er elects not to reconstruct according to the original plans and specifications, but in another location and upon new and different plans, the measure of damages is held to be the amount paid to the contractor for the original structure. See U. S. v. McMullen, 222 U. S. 460, 32 Sup. Ct. 128, 56 L. Ed. 269; U. S. v. U. S. Fidelity & Guaranty Co., 236 U. S. 512, 35 Sup. Ct. 298, 59 L. Ed. 696; Lincoln County v. Coast Bridge Co. (D. C.) 231 Fed. 468. Upon the facts here found, this rule obviously is not applicable, because, if the location and design of the original structure had been sufficient, the loss from faulty workmanship would have been slight and easily remedied.

[10] The measure of damages properly to be applied is that applicable to a contract which has been substantially performed but into the performance of which has entered defective materials or faulty workmanship, or departures from the plans and specifications. In cases of this character, two rules have been applied, depending somewhat upon the circumstances of each case. One is that the contractor is entitled to recover the contract price diminished by the difference between the value of the building to the owner in its defective condition, and its value if perfectly constructed. This rule is applied whenever the structure or building is useful to the owner in its defective condition and it is neither fair nor reasonably practicable to remedy the defects by the making of repairs. In other cases where there is a failure to complete the work, and such failure may reasonably be remedied by the expenditure of additional labor and materials, or where the defects are of such a character that they may be fairly and reasonably remedied by the expenditure of labor and materials, the proper rule seems to be to deduct from the contract price such sums as would be reasonably necessary to complete the work according to the contract or to make such repairs. Sutherland on Damages, § 699; Stillwell Mfg. Co. v. Phelps, 130 U. S. 520, 9 Sup. Ct. 601, 32 L. Ed. 1035; Gleason v. Smith, 9 Cush. (Mass.) 484, 57 Am. Dec. 62; Pelatowski v. Black, 213 Mass. 428, 100 N. E. 831. No finding, as has been said, is made by the master as to the difference in value between the reservoir in its defective condition, and the contract price, nor how much less valuable the reservoir is to the owner by reason of faulty workmanship. No evidence seems to have been offered on this proposition. The burden of proof in that situation is apparently on the owner. Filbert v. Philadelphia, 181 Pa. 530, 547, 37 Atl. 545; District of Columbia v. Clephane, 110 U. S. 212, 3 Sup. Ct. 568, 28 L. Ed. 122. Apparently the master's conclusion is that the reservoir, except as to the collapsed portion, was worth as much with the faulty workmanship as it would have been with perfect workmanship, and that by reason of its original defective design it was worth practically nothing in either condition, except as it served as a basis for the new and different reconstruction work provided for in the Casey contract.

[11] The sum of $56,350, found by the master to be necessary to remedy the faulty workmanship, would undoubtedly be the true measure of the city's damages, if the structure had otherwise been adequate. Such expenditure would have been a reasonable and practical way of

making repairs within the rules of law stated in the cases above cited. Moreover, it is the method of making repairs and the measure of damages provided in the contract for defects in material or workmanship, whether the necessity therefor arises before acceptance or afterwards and within the guaranty period of one year from the date of such acceptance. The difficulty in applying this rule is that the repairs were not made, for reasons for which the city alone was responsible. It would have been useless and unnecessary to make them in view of the method of reconstruction adopted by the city, and it is likewise true, upon the master's finding, that it would have been useless to have made them if some such plan of reconstruction had not been adopted, for a reservoir would not thereby have been produced fit for the purposes for which this one had been designed and built. The original structure, with these defects, was just as valuable under the plan of reconstruction as would the original structure have been with perfect workmanship. In view of all these circumstances, the master was right in holding that the cost of repairs which were not made, and the making of which would have served no useful purpose, is not to be taken as the true measure of the city's damage.

[12] In this situation, and in the absence of any finding of how much less the original reservoir in the defective condition was worth to the owner than the original contract price, or if perfectly built, the city is not entitled to complain of the measure of damages actually adopted by the master. The plaintiff does not complain. This measure, as already stated, is to deduct from the contract price all that was paid by the city to the contractor for that portion of the concrete work which was found to be defective by reason of faulty workmanship. The contractor ought not in equity to have or retain money paid to him for good work that was not done but was faulty or defective. If the contractor is required to surrender all compensation for that part of the work which was thus found to be defective, it would seem to me that substantial justice is done.

[13] 4. The master finds that the contractor was responsible for 119 days' delay in the completion of the work, which, at the rate of liquidated damages stipulated in the contract for each day's delay, amounts to $5,950. Plaintiff's exception to this finding is that it is not as a conclusion of law justified by the facts found by the master. This exception is not well taken. The contract is of that kind, in which liquidated damages may properly be stipulated for, and the amount of damages fixed thereunder, for each day's delay, is not so unreasonable as to be void as for a penalty. The master's conclusion of law is supported by the facts found, and these findings of fact appear to be supported by substantial evidence. See Wise v. U. S., 249 U. S. 361, 39 Sup. Ct. 303, 63 L. Ed. 647; Doan v. Rogan, 79 Ohio St. 372, 87 N. E. 263.

5. The master's findings that the plaintiff is entitled to recover on its second cause of action $7,444.39, on its fifth cause of action, $793.58, and on its sixth cause of action, $1,090.04, are not excepted to by the city. The correctness of these findings need not therefore be consider-

ed. It is sufficient to say that his conclusions of law from the facts found as to each cause of action appear to be in accordance with the authorities. See City of Cincinnati v. Cameron, 33 Ohio St. 336; Wyandotte, etc., Ry. Co. v. King Bridge Co. (6 C. C. A.) 100 Fed. 197, 40 C. C. A. 325; Wood v. City of Fort Wayne, 119 U. S. 312, 7 Sup. Ct. 219, 30 L. Ed. 416; Bridge Co. v. McGrath, 134 U. S. 271, 10 Sup. Ct. 730, 33 L. Ed. 934.

6. Plaintiff's fourth and fifth exceptions to the master's findings and conclusions of law that under the third and fourth causes of action, respectively, plaintiff is not entitled to recover, are not urged before me, and need not, therefore, be considered at length. Upon the facts found, it is sufficient to say that the master's conclusions of law appear to be in accord with the authorities. See Day v. U. S., 245 U. S. 159, 38 Sup. Ct. 57, 62 L. Ed. 219.

Applying these conclusions to the master's report, and sustaining and overruling the several exceptions in accordance therewith, judgment should be entered as follows: Plaintiff is entitled to recover the sum of $38,879.21, with interest on $32,657.86 from June 19, 1916, and interest on $6,221.35 from April 15, 1917; and the city is entitled to recover against plaintiff $5,950 liquidated damages, with interest from June 19, 1916, $14,635.68, with interest from November 1, 1916, and $346.49 with interest from May 15, 1917. A journal entry embodying these conclusions may be prepared and submitted by counsel.

The exceptions of the defendant the National Surety Company, in view of these conclusions, become immaterial. Its contention that it is released because of changes made in the plans and specifications without its consent, during the progress of the work, seems to me not to be well taken, and its exceptions on that ground should, if it becomes material, be overruled. See U. S. v. U. S. Fidelity & Guarantee Co., 236 U. S. 512, 35 Sup. Ct. 298, 59 L. Ed. 696; U. S. v. McMullen, 222 U. S. 460, 32 Sup. Ct. 128, 56 L. Ed. 269.