**SWEENY, Plaintiff-Appellee v STAPLETON et, Defendants-Appellants.**

Ohio Appeals, 8th District, Cuyahoga County.

No. 19028.   Decided October 13, 1942.

Joseph F. Smith, Cleveland, for plaintiff-appellee.

Thos. A. Burke, Jr., Law Director, Cleveland, and Joseph H. Crowley, Asst. Law Director, Cleveland, for defendants-appellants.

## OPINION

By LIEGHLEY, PJ.

My conclusion reached after a full examination of the record, briefs and authorities cited and read is:

"Decree for defendants for the reason that the obligations assumed by the purchase contract justified the Council in authorizing the payment by ordinance of said sum to partially meet and be within the rate of pay fixed by the arbitrators as a potential contractual liability and as the justifiable payment of a valid moral claim."

In the first place, it should be noted and emphasized that there is no tax money involved in this lawsuit. It concerns the assets and earnings of the railway company. It concerns monies apart from those levied and collected as taxes upon the property and holdings of Cleveland residents. It is distinctly a separate bookkeeping account of the city. The statutes enacted and designed as safeguards over the expenditure of strictly tax money are not necessarily applied or strictly designed to be applied to these funds when contracts are involved.

Whether or not the award of the arbitrators of an increase of pay of twelve and one-half cents an hour is reasonable and justified by the evidence presented to them, was not presented nor mentioned to us. It would not have been pertinent to any issue in this case.

On March 1, 1942, there was a contract existing and in full force between the Labor Union and the Railway Company by the terms of which, in the event of a dispute over rate of pay, the issue should be submitted to arbitration, the mechanics for which are set up in the contract. Such dispute then existed and arbitrators were promptly and duly appointed.

On April 28, 1942, the City of Cleveland elected to purchase the Railway Company under and through a contract of purchase and by its terms agreed to assume all contractual obligations of the Railway Company. One of these contractual obligations was the existing contract between the Labor Union and the Railway Company.

At that time a Board of Arbitrators were supposedly functioning under and by authority of the contract between the union and the railway company, and as of March 1, 1942, the members thereof were not in the employ of the Union or the Railway Company, nor of the City of Cleveland. They were merely appointed as provided

by the contract. They derived their authority from the provisions of the contract and the terms of the contract defined their duty and the limits of their duties were prescribed. Their chief and outstanding obligation in this instance was to hear and consider the evidence adduced and award a reasonable and fair rate of compensation to street car and bus employees for the period from March 1, 1942 to March 1, 1943.

The arbitrators made an award of 12½c per hour for the period from March 1, to April 28, on May 22nd. Upon what theory or upon what authority? It was said that the officers of the City insisted upon such limitation of the award. In the face of the contract between the Union and the Railway Company, and the assumption thereof by the City, by what authority? The contract provided for no such award. It can be justified only by claiming that the larger includes the smaller, a formula not resorted to in such matters.

It would seem that either this award has the legal effect of fixing the rate of pay for one year or it is a nullity. The arbitrators were not authorized or commissioned to make an award for two months. It should be deemed to fix the rate for one year or it determines nothing legally.

If the rate of pay fixed by the arbitrators for March and April was fair and reasonable compensation, it is safe to say that the same, or an approximate rate is fair and reasonable for three months thereafter and would have been so declared to be by the arbitrators but for the interference of certain officers of the City at the time and for which the City would be obligated by the assumptions in its purchase contract. If the rate had been determined and award made prior to April 28th as it might very well have been, then such rate would have been read into and become a part of the contract assumed to March 1, 1943.

When a municipaltiy in the exercise of its proprietary functions goes into business by way of engaging in the operation of a public utility and acquires same by a purchase contract, it should be held to the performance of its terms by every moral and equitable rule and by the same rules as control a private corporation under similar circumstances. When the terms of such contract are complied with and performed, a strictly municipal outlook may be justified and necessary for the public interest when the welfare of the general public will be best served thereby.

Whether there exists an enforceable contractual obligation on the City by reason of all the facts and circumstances affecting this situation, has not been decided. This issue was not presented or submitted to us for decision. However, so much may be said in favor of it, that when coupled with the public needs and indispensable requirements of the time, the payment of the money involved by the City in the manner proposed and at the instance of the City as a valid moral claim has ample legal support and justification to the end that there be no potential interruption or reduction of the

transportation facilities of the City in these times of urgency and stress.

Decree for defendants O. S. J.

MORGAN, J., SKEEL, J., concur in the judgment, for reasons hereinafter stated.

MORGAN. J., Concurring.

The majority of the Court are of the opinion that the persons named in the resolution adopted by the City Council of Cleveland on September 28, 1942, had a moral claim to additional compensation in the amount of $220,129.95 and that it became a legal claim binding on the City by the approval of the affirmative action of the Moral Claims Commission by the City Council on that date.

It is my opinion that the action of the City Council should be sustained on another ground, namely, that the Council without any action by the Moral Claims Commission had the power legally to put into effect the new schedule based on the old rate plus ten cents an hour, from and after April 28, 1942, the date of the acquisition of the system by the city.

Until April 28, 1942, the street transportation system in Cleveland was owned and operated by the Cleveland Railway Company. It had a wage agreement with its employees represented by Division 268 as a bargaining agent, which fixed the compensation to be paid its employees from March 1, 1941 to March 1, 1942. This agreement was to remain in force from year to year unless in proper time either party gave notice to the other of its desire to terminate or change the agreement. Such notice to change the agreement was given by Division 268 within the proper time and the Railway Company being unwilling to pay the wages asked by the Union, elected, according to the provisions of the contract between them, to have the controversy arbitrated and the arbitrators were duly chosen.

As stated, on April 28, 1942 following protracted negotiations, the City of Cleveland purchased all of the properties and assets of the Cleveland Railway Company and from and after that date the City has owned and operated the transportation system formerly under the control of the Cleveland Railway Company.

Prior to April 28th the City did not own or operate a transportation system of any kind and its Civil Service set-up and ordinances made no provision for a schedule of wages for the employees of such a system. On April 28th the arbitrators were in session but had made no determination of the issues presented to them. On May 22, 1942 the arbitrators announced their decision which was an increase over the old schedule of pay of 12½c an hour from March 1 to April 28. 1942. The arbitrators made no decision as to the wages to be paid after April 28th, as they believed and rightly so, that they were without power to fix wages after the acquisition of the system by the City. Later, the City voluntarily and without

protest paid the additional 12½c per hour from March 1st to April 28th, following the decision of the Board of Arbitration.

Inasmuch as the finding of the Arbitration Board when made would have no effect after April 28, 1942, and as the City had not established any wage scale of its own previously, it became necessary that the City Council should act by Ordinance before April 28th to fix temporary wage schedules to enable pay rolls to be made up and the system to be operated. It is obvious that the city could not postpones action until the arbitrators had reached a decision or until its own negotiations with the employees had been concluded, as the result of such failure to act by the City would make impossible the payment of any wages in the interim to the employees of the system. The City had to take some action in fixing wages before it acquired and started to operate the system.

Such being the problem facing the City Council, was there any statute, charter provision or rule of law which required that the City at that time should finally and irrevocably fix wages for the period in which the ordinance would be in effect? No such statute, charter provision or rule of law has been called to our attention and I know of none.

In other words, it was quite within the power of the City Council before April 28th to pass a stop-gap ordinance to permit payrolls to be made up and paid and at the same time reserving to itself the right finally to fix the wages to be effective from and after the acquisition of the system on April 28, 1942, based on the result of the arbitration then under way, and the city's subsequent negotiations.

On April 27, the City Council passed such an ordinance establishing a temporary schedule of rates which were substantially the same as those in force from March 1st, 1941 to March 1, 1942. The Company also, pending the completion of the arbitration, had operated on the same rate of pay from March 1st, to April 28, 1942, or as long as it operated the system. Later, the City conducted its own negotiations with its employees and the City Council passed an ordinance effective on July 13, 1942, which fixed the schedule of wages on the basis of the old rate of pay, plus 10c an hour. It is stipulated that when this ordinance was passed the city recognized the justice of the claim of the employees of the system that the increased wage should take effect from and after April 28, 1942, which was the date that the city began the operation of the system. It is to be noted that the rate of pay fixed on July 13th by ordinance was 2½c an hour less than the rates fixed by the arbitrators, and a prime consideration causing the employees to accept this reduction was the promise of the City that the increase of 10c an hour should be made effective from and after the date it acquired the system.

In order to carry out this agreement between the City and its employees, so called "moral claims" were presented by the employees to the Morals Commission for additional pay, at the rate of 10c an

hour from April 28 to July 13, 1942, and these claims were approved by the Morals Commission and later on September 28, 1942, by the City Council.

It is my opinion that the procedure by which moral claims were presented to the Commission was unnecessary and that the City Council had the right and power by ordinance to make the increased wages provided for in the ordinance of July 13th effective from and after April 28th, because in my opinion the ordinance of April 27 was not a final, irrevocable and unchangeable fixing of wages for the period of the ordinance, but was in the nature of a temporary or stop-gap ordinance to permit the operation of the system under city control while the final determination of the wages to be paid by the city from and after its acquisition of the property was to await the result of the arbitration and the conclusion of the city's own negotiations.

The parties have filed an important stipulation in the case bearing on this question, which is as follows:

"It is further stipulated that Ordinance No. 675-42 was understood by the Council and the representatives of the Street Car Employees to be a temporary measure in order to permit a payroll to be prepared and paid legally by the City of Cleveland, and that as soon as the proper adjustments could be made, legislation would be passed to put into effect an increase within the amount awarded by the Board of Arbitrators retroactive to the date of acquisition by the City."

The provisions of the ordinance are not inconsistent with the stipulation. The first paragraph of the ordinance is as follows:

"An emergency ordinance to provide a temporary schedule of compensation for the persons who, upon the acquisition of the street railway system by the City of Cleveland automatically will become employees in the classified service of the city by virtue of Sec. 142 of the Charter."

The necessity for the ordinance was stated in the ordinance as follows:

"Whereas, it is imperative that a temporary schedule of compensation be established for the several thousands new employees within the new division of municipal transportation, in order that there shall be no interruption in service upon the acquisition by the city of the street railway system."

It will be conceded that it would have been possible for the City Council to have framed an ordinance in which its stop-gap temporary character could have been more clearly set forth. A reasonable explanation of this fact is not difficult to find.

The City was about to become the owner of a transportation system and as such owner would be under the obligation while being fair to its employees, also to protect the interests of the car riders in the wage schedules finally established. Under these circumstances the city naturally would wish to avoid any declaration in the ordinance that the existing rate of pay was too low and that a later increase would be inevitable.

It is quite unreasonable to hold that the inclusion of such a declaration in the ordinance was necessary to enable the City Council to retain the power to make the wage scale thereafter agreed on, to take effect from and after the date of the acquisition of the system by the city.

This court is bound to give effect to the above stipulation unless the ordinance of April 27th is so unambiguous as not to permit of the construction given it by the above stipulation, namely, that the Council reserved the power thereafter to enact "legislation" * * * * "to put into effect an increase within the amount awarded by the Board of Arbitration, retroactive to the date of the acquisition by the City."

It is my opinion that considering the terms of the ordinance and conditions obtaining at the time of its enactment, the construction placed upon it in the above stipulation on file in this case, is not only permitted but is in fact required.

It is not claimed that the ordinance of April 27th was passed after any hearings by the City Council or any of its Committees, or that it represented the considered judgment of the Council as to what would be fair and reasonable wages to be paid by the City to its employees.

If the fair wage rate after July 13. 1942, was the old scale, plus ten cents an hour, it is clear that a fair rate from April 28, 1942 to July 13, 1942 was no less. If the action of the City Council on September 28, 1942, was invalid, then we have this situation:—the wages paid from March 1st to April 28th were on the basis of the old scale, plus twelve and one-half cents per hour. From April 28 to July 13th the employees were paid the old scale. From and after July 13th the wage scale was substantially the old scale plus ten cents an hour. It is obvious that no person in his right mind could ever have deliberately intended such a crazy quilt pattern of three different rates of pay in a period of less than three months. It would be a reflection on our legal machinery if it would be found powerless to correct such a situation.

Clearly the employees of the Company cannot fairly be asked to accept for the period from April 28 to July 13, 1942, twelve and one-half cents an hour less than fixed by the Arbitration Board, and ten cents an hour less than later determined by the City Council to be a fair wage when they had been given every assurance that the wage rate which they would be willing to accept would be put into effect from the date of the acquisition of the system by the city.

The action of the City Council on September 28, 1942 while it

took the form of an approval of certain "moral claims" in my opinion can also be sustained on the ground that the City Council by reason of the stop-gap provisional character of the ordinance of April 27th, retained full power to make any wage rate which it would afterwards find to be fair and reasonable, effective from and after the date of the acquisition of the system by the City.

This conclusion makes it unnecessary for me to find whether or not, if the City Council did not retain such power, the amount voted by the City Council on September 28. 1942, can be sustained as an approval of certain "moral claims" which had been approved by the Morals Commission.