**BURT, Plaintiff-Appellant v. CLEVELAND (City) et al., Defendants-Appellees.**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 19709. Decided April 23, 1945.

McKeehan, Merrick, Arter & Stewart, Cleveland, for plaintiff-appellant.

Lee Howley, Director of Law, Cleveland, Samuel T. Gaines, Cleveland, Counsel for Transit Board, Robert J. Shoup, Cleve-

land, Counsel for Transit Board, Thompson, Hine & Flory, Cleveland, for Firemen's Mutual Insurance Company, Hon. Felix Herbert, for Firemen's Mutual Insurance Company, for defendants-appellees.

## OPINION

By SKEEL, P. J.

The City of Cleveland, during the month of April, 1942, purchased, and since that time has operated, the street-car system situated in Greater Cleveland. The Charter of the City of Cleveland as amended by Section 113-2, to provide for the purchase of the railway system establishes a Transit Board of three men to direct its operation. The Cleveland Railway Company, the predecessor owner of the system, carried fire and extender coverage insurance with the defendant, The Firemen's Mutual Insurance Company. This policy was issued on the basis of a blanket coverage without co-insurance. The expiration date of the policy was March 1, 1943. The City of Cleveland, as indicated, acquired the property in April, 1942. The effective date of this insurance was extended to May 1, 1943, by agreement between the Transit Board and the Insurance Company, to allow sufficient time in which to purchase another policy of insurance to take the place of the policy which was expiring.

The Transit Board by resolution passed on January 29, 1943, directed that bids be advertised for to provide the needed coverage. Thereafter specifications were prepared, bids were received and opened and on March 9, 1943, the Board, by resolution, awarded the contract to The Firemen's Mutual Insurance Company.

Thereafter, some question was raised as to whether "Firemen's", the successful bidder, met the requirements of the specifications, and as a result on March 18th, 1943, the Transit Board, rescinded its award to "Firemen's", rejected all bids and directed that bids be again advertised for, after amending the specifications.

On March 31, 1943 and on April 7, 1943, the purpose of the Transit Board to purchase insurance in accord with the established specifications, was advertised and bids were received, the last filing date for such bids being fixed as of April 16, 1943.

On April 9, 1943, in answer to a request for further information by one of the bidders, the following notice was sent to all registered bidders:

"Notice to all bidders on fire and extended coverage insurance: Explanation is hereby made with respect to inquiries raised in connection with proposal for fire and extended coverage insurance due April 16, 1943 * * * * * *:

. (a) With reference to omission of a bid under Item I of the Proposal Sheet, on a flat rate (no co-insurance) basis, you are hereby advised that bids covering both flat rate and co-insurance are requested from each bidder. The omission of the flat rate in any bid may be cause for rejection of the bid, in accordance with paragraph 14, page 3 of the specifications."

The foregoing explanation of the specifications was made necessary because such specifications provided in part:

"Form of Proposal: All bids * * * * * shall be on the basis of (1) flat rate (no co-insurance), blanket * * * * *; (2), ninety percent (90%) co-insurance on schedule A blanket * * * * *; One hundred (100%) percent co-insurance on schedule B blanket * * * * * * *."

And one of the bidders had made an inquiry as to whether or not a bid that included only one of the alternatives would be considered.

On April 30, 1943, the Transit Board upon opening the bids, again awarded the contract to "Firemen's" and this action seeks to enjoin the entering into such contract because it is claimed:

1. That the specifications prevented competitive bidding inasmuch as the stock companies are unable to issue blanket coverage policies on the property of the system on a no co-insurance basis without first having filed a deviation with the rating board as provided by §9592 GC.

2. That the specifications provided that each bidder should accompany his bid with the form of policy he proposed to issue, and therefore there could not be competitive

bidding where the terms of the policy are not fixed by the transit system.

·3. That the contract which the commission proposes to enter into with "Firemen's" is upon the mutual insurance basis and requires the system to incur a contingent liability of not more than five times the amount of the premium deposit and by the provisions of §9575 GC the insurer is accorded the right to perfect a lien on all the property of the system to the amount of such contingent liability and that the transit board is without power to grant such a lien on the property of the system.

4. That by the provisions of Section 113-4 of the City Charter, the system is without power to enter into a contract calling for the expenditure of an amount in excess of $10,000.00 unless authorized so to do by the City Council; that the amount to be expended in the proposed contract is in excess of that amount and that the Council has not authorized the Transit Board to·incur a contingent liability such as will result by awarding the contract to "Firemen's."

5. That the making of a deposit of $109,982.59 as required by the proposed contract with "Firemen's" is unlawful.

ʹ6. That sections 106 and 109 which require that there must be a certification that the funds to be expended are available in the proper fund has not been complied with because there has been no such certification as to the necessary funds to cover the contingent liability of $549,912.95.

7. ·The bid of the "Firemen's" was incapable of acceptance by the Transit Board for want of definiteness, because of the contingent liability.

8. That the bid of "Firemen's" was not the lowest bid because it was subject to said contingent liability.

The ability of a stock fire insurance company to write "blanket coverage no co-insurance" is nowhere questioned.

It is also brought out clearly by the record that the Transit Board concluded that that kind of coverage was better suited to the needs of the system than would be. true of an insurance policy which required the system to assume a part of the risk in event the amount of insurance placed should fall below 90% of the value of the property in question.

The published specifications, from the very beginning, included both coverage with and without co-insurance, which indicated clearly that bids on both kinds of coverage were requested. Therefore, all bidders, even if it be admitted that notice of a deviation would be required as provided by §9592-9 GC, had plenty of time to file such notice fifteen days before the effective date of·the risk.

From the undisputed evidence, the stock companies had not, through their rating bureau, placed a rate on the property of the Cleveland Transit System, on the basis of blanket coverage, flat rate, no co-insurance. This being so, there was no need for filing a deviation. Until a rate on the basis of no co-insurance has been established, a deviation would be impossible.

The appellant further claims that the fact that the specifications required the bidders to file the form of the policy which the bidder proposed to use, prevented competitive bidding. Such a contention cannot be sustained. The transit system had by its specifications set forth the kind and character of insurance required. It was, therefore, the specifications that controlled the requirements of the system's insurance needs and the only possible purpose of requiring the filing of the form of the bidder's policy was to make sure that the bidder would fulfill the requirements set forth in the specifications.

It is next contended that the Transit Board is without power to grant a lien on the property of the system to the extent of the contingent liability that may arise when a property is insured under the "mutual plan."

Sec. 9575 GC provides:

"Lien of Mutual Companies for Premium Notes: All buildings insured by a mutual company must be pledged to such company, together with the right and title of the assured in the lands upon which they are situated, to the amount of the premium note or contingent liability, and the company shall have a lien thereon to the amount of such note or liability, but the lien shall not take effect until the company files with the recorder of the county in which the property insured is located, a certificate stating the date, number and amount of premium notes or contingent liability, and such a description of the property insured as will enable a person readily to identify it."

Section 6 of Article VIII of the Constitution of Ohio provides as follows:

"No laws shall be passed authorizing any county, city, town or township, by vote of its citizens, or otherwise, to become a stockholder in any joint stock company, corporation, or association whatever; or to raise money for, or to loan its credit to, or in aid of, any such company, corporation or association; provided, that nothing in this section shall

prevent the insuring of public buildings or property in mutual insurance associations or companies. Laws may be passed providing for the regulation of all rates charged or to be charged by any insurance company, corporation or association organized under the laws of this state, or doing any insurance business in this state for profit."

From the foregoing constitutional provision it is clear that a political sub-division is empowered to insure public property in a mutual insurance association or company. If this be so, there is no difficulty in concluding that such power includes the right to do all things that are necessary to meet the statutory requirements for that kind of insurance coverage.

It is further a logical conclusion that when the city council on February 15, passed an ordinance authorizing the transit board to contract for "fire and supplemental insurance protection" of the property of the system, for a period of three years, by contracting therefor with the lowest responsible bidder, no restriction was intended as to whether such contract should be with an old line or a mutual company or association. This matter was left to the sound discretion of the transit board, restricted only by the necessity of contracting with the lowest responsible bidder and empowering the board to do all things necessary to effect a valid contract with such bidder. If it be granted that "Firemen's" was the lowest responsible bidder, proposing to furnish the type of coverage which the transit board had determined was for the best interest of the system coming within the terms of the published specifications, the contract proposed was one which the Board in the exercise of the power granted it, under the Constitution of the State, and the enabling ordinance of the City of Cleveland, was authorized to enter into.

It is further contended that the deposit of the premium, in consideration for which "Firemen's" agreed to furnish the transit system the insurance required, constituted an illegal deposit of public funds. The answer to such contention is that the money paid for the insurance was not, in fact or law, a deposit such as would create a debtor-creditor relationship. Under no circumstances could the transit system call upon "Firemen's" to return any part of such deposit. The only possible way in which any of the premium deposit could be returned to the transit company would be in the form of a dividend, the amount of which could not be determined until the losses and cost of doing business for the premium year

had been determined. As was said by the Supreme Court in the case of **State ex rel Attorney General v Monitor Fire Association, 42 Oh St 555** at page 566:

"The annual 'deposit' required is but another name for annual premiums. If these annual deposits exceed the necessary expenses and losses during a given year, they are treated as 'savings' out of which dividends are paid to those who may thus be members."

We come now to the question as to whether or not the contract is illegal because it is claimed by appellant that the requisite certificate that the funds were available in the proper account was not made and the further claim that the bid which was accepted was not the lowest bid.

The first of these contentions is based upon the theory that the certificate which was furnished by the Comptroller of the system, that there were sufficient funds available in the proper account to meet the expenditure of $109,982.59 for fire and extended coverage insurance, was not sufficient and not in compliance with Section 106 of the City Charter, because the total financial obligation of the transit system under the proposed contract was $659,895.04. Such figure is arrived at by adding the premium requirements of the policy to the so-called contingent liability of $549,912.95. Section 106 of the City Charter reads as follows:

"Section 106: No contract, agreement or other obligation, involving the expenditure of money, shall be entered into, nor shall any ordinance, resolution or order for the expenditure of money be passed by the Council, or be authorized by any officer of the city, unless the director of finance first certify to the council or to the proper officer, as the case may be, that the money required for such contract, agreement, obligation or expenditure is in the treasury, to the credit of the fund from which it is to be drawn, and not appropriated for any other purpose, which certificate shall be filed and immediately recorded. The sum so certified shall not thereafter be considered unappropriated until the city is discharged from the contract, agreement or obligation."

All that is required under this section, if it be conceded that a certificate is necessary, where the funds to be expended were not derived by taxation, is that "the money required for such contract" be certified as available. By the overwhelming

weight of the evidence, the certificate made fully complies with the charter requirements. One Hundred and Nine Thousand, Nine Hundred and Eighty-Two Dollars and Fifty-nine Cents ($109,982.59) was what the Transit System was paying for the policy of insurance. No other expenditure of money was even remotely possible, and under the theory of the case of Walsh Construction Company v City of Cleveland, 271 Fed. 701, the certificate was "the closest possible compliance" with the charter provision.

The debt that is contracted for in this purchase of fire and extended coverage insurance is a necessary part of the conduct of the transit system. The funds to be expended therefor are those derived from the revenue received from its operation and in no way involves moneys received by the city from taxation. Section 106 of the City Charter is therefore not applicable and a certificate of the Comptroller is unnecessary.

In the case of **Kerr v Bellefontaine, et al, 59 Oh St 446,** the Supreme Court had under consideration the applicability of Section 2702 Revised Statutes (Old §3806 GC now part of §5625-33 GC) (which was copied into the Cleveland Charter as Section 106 in its original form without change) with regard to the purchase of materials for the operation of the city's gas plant. The city managed its plant through "gas trustees" and in the operation of the business they purchased meters and valves and other equipment necessary for the successful operation of the business without procuring a certificate as provided by the statute. Upon this subject the court on page 463 of the opinion adds:

"* * * * * nor are the trustees in the exercise of this authority restricted by the provisions of Sec. 2702 of the Revised Statutes that 'no contract, agreement or other obligation involving the expenditure of money shall be entered into, nor shall any ordinance, resolution or order for the appropriation or expenditure of money be passed by the city council or by any board or officer of a municipal corporation, unless the auditor of the corporation, and if there is no auditor, the clerk thereof, shall first certify that the money required for the contract, agreement or other obligation, or to pay the appropriation or expenditure, is in the treasury to the credit of the fund from which it is to be drawn, and not appropriated for any other purpose * * * * * * *.'

Not only was this requirement of the statute designed to place a restriction upon the increase of municipal indebtedness, but its terms are inapplicable to a contract of this

character. The requirement is that the certificate must show that the money required for the contract is in the treasury to the credit of the fund and not appropriated for any other purpose. The fund from which the plaintiff is entitled to satisfaction of his demand is not raised by taxation. It is derived from the operation of the gas works and made subject to the order of the board whose authority is so limited that they can make valid contracts only for appliances and supplies for the gas works to which the fund is devoted. The fund can be appropriated to no other purpose and the trustees can contract for no other purpose."

See also, **Insurance Co. v Wadsworth 109 Oh St 440-452.**

This court, in the case of **Sweeny v Stapleton 38 Abs 213** decided October 13, 1942, has expressed the same theory with regard to monies expended by a political subdivision other than monies which are derived from taxation. We conclude, therefore, that the Traction Board was authorized to enter into this contract of insurance without a certificate from the Comptroller as provided by Sec. 106 of the City Charter.

And finally, it is the contention of the appellant that the bid accepted by the Transit Board was not the lowest bid.

The appellant's contention upon this point is that the bid of another stock company on blanket coverage no co-insurance basis, of $149,195.60 net, without the possibility of reduction of cost by a dividend, is less than "Firemen's" bid of $109,982.59 with the right of a reduction in cost by dividend at the conclusion of the contract, because of the assumption as required by the contract of the contingent liability not to exceed five times the premium deposit which with the premium deposit would total $659,895.24.

The undisputed evidence as to the improbability of the transit system's being called upon to pay to "Firemen's" more than the premium deposit, is almost conclusive. During the course of the trial, the following facts were stipulated by and between the parties:

"1. That the Firemen's Mutual Insurance Company has been in existence and conducting the business of Mutual Fire Insurance continuously for ninety years.

\* \* \* \* \* \* \*

\* \* \* \* \* \* \*

4. That as of April 30, 1943, it had never levied an assessment against its policyholders pursuant to the contingent liability provisions of its policies of insurance.

5. That since April 30, 1943, and prior to March 1, 1944, the date of this stipulation, Firemen's Mutual Insurance Company had not levied an assessment against its policy holders pursuant to the contingent liabilities provisions of its policies of insurance.

6. That Firemen's Mutual Insurance Company premium deposit return or so-called dividends to policy holders over the past thirty years have never been less than 90% of the premium deposits on one-year policies, and .70% on three year policies.

\* \* \* \* \*

\* \* \* \* \*

\* \* \* \* \* ''

Certainly the Transit Board had the right in the light of the undisputed facts, in the exercise of sound judgment, to conclude that the bid of "Firemen's" was the lowest responsible bid received on its proposal for fire insurance with extended coverage.

For the foregoing reasons a decree will be entered for the defendants appellees as in the court of common pleas. Exceptions noted.

LIEGHLEY, J. and MORGAN, J., concur.