CLEVELAND ELECTRIC ILLUMINATING CO., APPELLANT, *v.* CITY
OF CLEVELAND, APPELLEE.
CLEVELAND ELECTRIC ILLUMINATING CO., APPELLEE, *v.* CITY
OF CLEVELAND, APPELLANT.

[Cite as Cleveland Electric Illum. Co. v. Cleveland
(1976), 50 Ohio App. 2d 275.]

276

(Nos. 34959 and 35002—Decided December 2, 1976.)

*Messrs. Bartunek, Bennett & Garofoli, Mr. Isaac Schulz* and *Mr. Donald H. Hauser,* for the Cleveland Electric Illuminating Company.

*Mr. Vincent Campanella, Mr. Robert D. Hart* and *Mr. William B. Schatz,* for the city of Cleveland.

JACKSON, C. J. The City of Cleveland (hereinafter designated "City," appellee in Case No. 34959 and appellant in Case No. 35002) operates the Municipal Electric Light Plant (hereinafter designated "MELP") serving approximately twenty per cent (20%) of the retail load within the City of Cleveland. The remainder of that load is served by the Cleveland Electric Illuminating Company (hereinafter designated "CEI," appellant in Case No. 349-59, and appellee in Case No. 35002), a public utility under the Federal Power Act.[1]

The facilities of MELP have been described as " * * * an isolated, poorly designed and relatively unreliable system * * * consisting of generating units in a 'sad state of repair' and a history of inefficient operations.' "[2] Since 1942 there have been intermittent proposals for a permanent interconnection between CEI and MELP. The parties, however, failed to come to any agreement until after MELP experienced a severe power outage during Christmas, 1969.

Officials of CEI and the City met after the Christmas, 1969 outage and developed a basic understanding for the interconnection of the two systems. As a result of this understanding on January 19, 1970, the City Council enacted Ordinance 161-70[3] authorizing the director of public utilities

---

[1] See Section 824e, Title 16, U. S. Code.

[2] Presiding Examiner's Initial Decision in Consolidated Proceedings before the Federal Power Commission, Docket Nos. E-7631 and E-7633, p. 1; *modified and as modified aff'd,* Federal Power Comm. Opinion No. 644 (January 11, 1973); *rev'd on other grounds, City of Cleveland* v. *Federal Power Comm.* (D. C. Cir. 1976), 525 F. 2d 845.

[3] City Ordinance No. 161-70 states:

"Whereas, The recent outages at the Muny Light Plant resulted in hardship to many Cleveland users and created a safety hazard due to the nonperformance of street lighting; and

to contract with CEI for the purchase of power.[4] The ordinance also specified the rates to be paid by the City for the purchase of such power.

Pursuant to the power granted him in Ordinance No. 161-70 the Director of Public Utilities, Ben F. Stefanski, II, entered into a contract with CEI for the wholesale pur-

---

"Whereas, it is important that a tie-in is completed, temporary measures will be taken to assure assistance in case of another emergency; and

"Whereas, This ordinance constitutes an emergency measure providing for the usual daily operation of a municipal department, now, therefore

"Be It Ordained By The Council Of The City Of Cleveland:

"*Section 1.* That Ordinance No. 115-70 passed January 12, 1970 be and the same is hereby repealed.

"*Section 2.* That the Director of Public Utilities be and he hereby is authorized to enter into an agreement with the Illuminating Company whereby a temporary tie-in will be effected between the Municipal Light Plant and the CEI at the Collinwood Substation and the Artic [*sic*] Substation, the Denison Substation, the Western Substation and the Clinton Substation.

"Said agreement will be prepared by the Director of Law and shall provide that the City will reimburse the Illuminating Company for the cost of the interconnection and shall indicate therein the amount of load to be transferred to CEI at each Substation.

"Said agreement shall provide further that the CEI shall sell said power to the City at a rate not to exceed 30c a month per KVA demand, $0.0085 per KWH for 10 million KWH and $0.005 per KWH above 10 million.

"*Section 3.* The cost herein authorized shall be paid from Fund No. 201 (B. O. 1297-68), Request No. 16-70.

"*Section 4.* That this ordinance is hereby declared to be an emergency measure and, provided it receives the affirmative vote of two-thirds of all the members elected to Council, it shall take effect and be in force immediately upon its passage and approval by the Mayor; otherwise it shall take effect and be in force from and after the earliest period allowed by law.

"Motion to suspend rules. Charter and statutory provisions and place on final passage.

"The rules were suspended. Yeas 33, Nays 0.

Read second time. Read third time in full. Passed.

Yeas 33, Nays 0."

'Ordinance 161-70 also repealed Ordinance 115-70 enacted seven days previously which also authorized the director of public utilities to contract with CEI for the purchase of electric power.

chase of electric power. The contract was contained in a letter from Lee C. Howley, vice president and general counsel of CEI, to Mr. Stefanski. The rates agreed to in this "letter agreement" were filed with and approved by the Federal Power Commission (hereinafter designated "FPC")[5] pursuant to the Federal Power Act.[6] The letter agreement and the FPC rate schedule were amended by the parties through subsequent letters three times.[7] During all these proceedings no objections were interposed by the City to the letter agreement or its filing under federal law.[8]

The interconnection was initiated in February, 1970, and the record reveals that CEI performed all of the responsibilities required of it under the letter agreement. The City, however, increasingly fell behind in its payments to CEI, and on February 18, 1971, CEI filed suit against the City in the Common Pleas Court of Cuyahoga County, Ohio[9] (hereinafter the first action).

While this suit was pending in Common Pleas Court, the City, fearing that CEI would terminate the interconnection for non-payment, filed a complaint with the FPC.[10] The complaint sought an order directing CEI not to disconnect from MELP, a determination of the rates due CEI for the power supplied since the initiation of the interconnection,[11] and an order directing CEI to maintain a permanent interconnection with MELP.

On March 10, 1972, the FPC ordered that as of May 17, 1972, CEI must maintain a temporary emergency interconnection with MELP, pending final determination of the City's complaint. Prior to this date CEI had voluntar-

---

[5]FPC Rate Schedule No. 7.

[6]Sections 824d and e, Title 16, U. S. Code.

[7]March 17, 1970; June 9, 1970; and July 22, 1970.

[8]Section 824e, Title 16, U. S. Code, allows the filing of a complaint to challenge filed rates.

[9]C. P. No. 892,126; C. A. No. 35002

[10]E-7631

[11]This was the first time the City objected to the rates contained in the letter agreement and alleged that those rates differed from the rates specified in the City Ordinance. The City has not explained why it waited over a year and until it was substantially in arrears to CEI before raising this objection.

ily maintained the interconnection.[11] Interim rates for this temporary interconnection were set by another FPC order.

The FPC issued its final order resolving the City's complaint on January 11, 1973—Order 644. The FPC directed that a permanent interconnection be maintained between CEI and MELP and specified the rates which CEI could charge for this power. The order made these rates retroactive to May 17, 1972, the date the FPC first ordered CEI to maintain the interconnection. Included within the rates was a sanction for late payment by the City. The order also determined the rates prior to May 17, 1972.

In deciding the rates allowable prior to this date the FPC relied upon the filed rate doctrine[13] and determined that the rates were to be those contained in the letter agreement filed with the FPC. The commission ignored City Ordinance No. 161-70, stating that the effect of this ordinance was only a "local matter between the City and its officials."[14]

The City filed a timely notice of appeal to the United States Court of Appeals for the District of Columbia Circuit,[15] pursuant to federal law. The City alleged that the commission erred first in dismissing the City Ordinance as only a matter of local concern in determining the rates prior to May 17, 1972; second, in that the permanent rates lacked substantial supporting evidence; third, in including an amount of Ohio excise tax in the makeup of the permanent rates; and fourth, in sanctioning a charge for late payment.

---

[12]The letter agreement provided that the "* * * transfer of load service will be provided until two gas turbines contracted for by the City are in commercial operation, or December 31, 1971, whichever is earlier."

[13]The filed rate doctrine basicly states that a public utility may charge only the rate on file with the Commission unless changed in a manner sanctioned by the regulatory statute, *Pennsylvania Railroad Co.* v. *International Coal Co.* (1912), 230 U. S. 184, 57 L. Ed. 1446.

[14]Presiding Examiner's Initial Decision in Consolidated Proceedings before the Federal Power Commission, Docket Nos. E-7361 and E-7633, p. 10; *modified, and as modified aff'd,* Federal Power Commission Opinion No. 644 (January 11, 1973).

[15]Case No. 73-1282

While the appeal was pending in the United States Court of Appeals, CEI filed a second action in the Common Pleas Court of Cuyahoga County, Ohio[16] (hereinafter designated the second action). The second action prayed the court for monies due since May 17, 1972, for the sale of electric power to the City by CEI.

The first and second actions were consolidated for trial and heard without a jury. The court entered its final judgments in both cases by entries dated June 4, 1975. In the first action the court found that the contract between the City and CEI contained in the letter agreement was valid and enforceable, and the City Charter provisions[17] alleged by the City as a defense were inapplicable to the controversy. The court awarded CEI damages of $547,115.33, and interest, for breach of the agreement.

In the second action the court dismissed the complaint for want of jurisdiction.

The City appealed from the judgment against it in the first action. CEI appealed from the dismissal of the second action. The cases were consolidated in this court.

There appears to be no dispute[18] that while these appeals were pending the FPC upon motion of CEI[19] issued an order dated April 8, 1974, which directed the City to comply with

--------

[16]C. P. No. 917,167; C. A. No. 34959

[17]*See* Section IV, *infra.*

[18]Occurrences subsequent to the hearing in the trial court are not contained in the record. The City, however, has attached copies of relevant documents to its brief and CEI has stipulated in open court that the documents accurately reflect the proceedings.

[19]In response to a previous motion by CEI praying that the FPC enforce its orders the City responded that "* * * there is no refusal to pay the bills [of the City] but a present inability to do so * * *." The City went on to argue to the Commission that the motion should be overruled and "* * * CEI remitted by the Commission to CEI's proper remedy in the state court." The City has been unable to explain to the satisfaction of the court why at the same time it was urging the Common Pleas Court to dismiss for want of jurisdiction, it was urging the FPC that the Commission should take no action against the City, as CEI's proper remedy was in state court.

all previous orders of the FPC.[20] The FPC subsequently filed suit against the City in the United States District Court for the District of Columbia[21] pursuant to Section 825m(a), Title 16, U. S. Code,[22] praying that the City be enjoined from further violating the April 8, 1974 order. CEI was allowed to intervene as a new party plaintiff.[23]

[20]More specifically, the order stated:

"(B) The City of Cleveland will henceforth pay CEI all sums past due to which no controversy attaches as well as accrued interest charges. With respect to that portion of any bill presently due and owing and to which controversy does attach, the City is ordered to place that sum in a special escrow account. With respect to bills for future services the City is ordered to pay CEI those sums to which no controversy attaches, as well as any interest charges that accrue. With respect to that portion of any future bill to which a controversy does attach, the City is ordered to place that sum in the same escrow account. The amounts deposited in escrow will include all interest charges accrued up to and including the date on which the disputed amounts are so placed. The sums placed in escrow will remain there pending judicial review in these proceedings, and the final escrow account balance, as well as all interest accrued while those sums were in escrow, will be distributed in accordance with the findings and order of the reviewing court. The Commission retains authority to approve the City's selection for the placement of the special escrow account." It was not appealed.

[21]Case No. 75-2081

[22]Section 825m(a), Title 16, U. S. Code, states:

"Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule, regulation, or order thereunder, it may in its discretion bring an action in the proper District Court of the United States, the United States District Court for the District of Columbia, or the United States courts of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices and to enforce compliance with this chapter or any rule, regulation, or order thereunder, and upon a proper showing a permanent or temporary injunction or decree or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available concerning such acts or practices to the Attorney General, who, in his discretion, may institute the necessary criminal proceedings under this chapter."

[23]CEI prayed for a temporary and permanent injunction to prevent the City from violating the FPC order of April 8, 1974.

While this suit was pending in the District Court, the United States Court of Appeals for the District of Columbia Circuit ruled upon the City's appeal from FPC Order 644. In *City of Cleveland* v. *F. P. C.* (D. C. Cir., 1976), 525 F. 2d 845, the court affirmed the decision of the Commission in all aspects of its order save for its ruling on rates prior to May 17, 1972.

The court found it was error for the FPC to adopt the rate structure filed by CEI without considering the City ordinance. That is, it was error for the FPC to dismiss the ordinance as purely a local matter. The court expressed no opinion as to whether the ordinance had any applicability to the dispute.

In the first action (Case No. 35002) before this court the City of Cleveland assigns three errors:

"I. The Common Pleas Court Had No Jurisdiction to Consider the matters before it.

"II. Assuming *arguendo* that the Court had jurisdicion, the Charter of the City of Cleveland is valid and applicable to City contracts and to this controversy.

"III. Assuming *arguendo* that the Common Pleas Court had jurisdiction, Ordinance 161-70, setting forth the rates to be charges, [*sic*] is a valid ordinance and applicable to this controversy."

In the second action (Case No. 34959) CEI assigns one error:

"The Court should not have dismissed this action for lack of subject matter jurisdiction since this is essentially a collection action by CEI for electrical power sold and delivered to the City of Cleveland and, as such, this action is obviously adjudicable in state court and it is patently immaterial that the rates CEI charged the City were established and prescribed by the Federal Power Commission."

## I.

The first assignment of error by the City in the first action and the assignment of error by CEI in the second action both raise the same issue: whether state courts have jurisdiction to render judgment against a delinquent deb-

tor where the debts arise from the wholesale purchase of electricity.

The City contends that no such jurisdiction exists; it argues that in each case CEI is attempting to use the state courts to enforce orders of the FPC. With respect to the first suit, upon the filing of the letter agreement with the FPC the rates filed were tantamount to a specific order of the FPC. In the second action CEI is requesting the court to make a determination of its rights based upon FPC Order No. 644. In both cases CEI is subject to Section 317 of the Federal Power Act, Section 825p, Title 16, U. S. Code. Under this section, "[t]he District Courts of the United States * * * shall have exclusive jurisdiction of violations of [the Federal Power Act] or the rules, regulations, and orders thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of, this chapter or any rule, regulation, or order thereunder." If this statute is applicable, the state courts would be deprived of jurisdiction in this matter.

The United States Supreme Court was confronted with the same issue in *Pan American Petroleum Corporation* v. *Superior Court of Delaware* (1961), 366 U. S. 656, 6 L. Ed. 2d 584. In that case a natural gas pipeline company purchased gas from two natural gas producers for transportation in interstate commerce. The company was required to pay a higher price than stipulated in the contract by order of the Kansas Corporation Commission. The excessive charges were paid under protest, while challenging the validity of the order which was subsequently held to be invalid. The company brought suit in the Superior Court of Delaware against the natural gas producers to recover the overpayments. The gravemen of the suits was implied contract to refund overpayments, if they were held invalid, and restitution based upon unjust enrichment.

The defendants moved for summary judgment based upon lack of jurisdiction. Their arguments were the same as those presented by the City in the case at bar, to-wit: under the Natural Gas Act the price to be paid for natural

gas sold wholesale in interstate commerce must be in accordance with rates filed with the Federal Power Commission. Since the suits filed by the plaintiff involve rates so filed, they must either be to enforce a filed rate or to challenge a filed rate. If the suits are in the former category, they are subject to Section 22 of the Natural Gas Act, which provides that "[T]he District Courts of the United States * * * shall have exclusive jurisdiction of violations of [the Natural Gas Act] or the rules, regulations, and orders thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by or to enjoin any violation of this chapter, or any rule, regulation or order thereunder." Section 717u, Title 15, U. S. Code. If the suits are in the latter category, they lie within the purview of Section 19 of the Natural Gas Act which provides for review of commission orders in the United States Court of Appeals, Section 717r, Title 15, U. S. Code. In either case, the state courts are deprived of jurisdiction.

The trial court denied the defendant's motion for summary judgment, and the defendants brought a writ of prohibition in the Supreme Court of Delaware. That court sustained the jurisdiction of the trial court and denied the writ.

On certiorari, Justice Frankfurter speaking for a unanimous United States Supreme Court, affirmed:

"* * * questions of exclusive federal jurisdiction and ouster of jurisdiction of state courts are, under existing jurisdictional legislation, not determined by ultimate substantive issues of federal law. *The answers depend on the particular claims a suitor makes in a state court—on how he casts his action.* Since 'the party who brings a suit is master to decide what law he will rely upon,' *The Fair* v. *Kohler Die & Speciality Co.*, 228 US 22, 25, 57 L. Ed. 716, 717, 33 S. Ct. 410, the complaints in the Delaware Superior Court determine the nature of the suits before it.'' (Emphasis added.) 366 U. S. at 662, 6 L. Ed. 2d at 589.

The court held that the rights asserted by the plaintiff were traditional common law claims, and that they did not lose that character because it is common knowledge

that there exists a scheme of federal regulations of interstate transmission of natural gas.

The Supreme Court further held that Section 22 of the Natural Gas Act does not afford assistance for the petitioner:

"* * * 'Exclusive jurisdiction' is given the federal courts but it is 'exclusive' only for suits that may be brought in the federal courts. Exclusiveness is a consequence of having jurisdiction, not the generator of jurisdiction because of which state courts are excluded." 366 U. S. at 664, 6 L. Ed. 2d at 590.

Finally, the court dismissed the contentions of defendants that the state court suit would jeopardize the uniform system of regulations established by Congress. "* * * [T]he route to review [by the United States Supreme Court] is open to parties aggrieved by adverse state court decisions of federal questions"; thereby uniformity is maintained. The attainment of uniformity *does not* require that in every case where the construction of a federal law is in dispute that resort must be made to the federal system.

Other federal courts have followed the *Pan American* decision in interpreting other federal statutes giving the United States District Courts exclusive jurisdiction over federal regulatory statutes, rules, regulations and orders. In *McMahon Chevrolet, Inc.* v. *Davis* (S. D. Texas, 1975), 392 F. Supp. 322, the court held that there was no authority for ruling that Congress intended to prevent state courts from deciding cases which might have been brought under the Securities Exchange Act of 1934 if the plaintiff had so desired. The court went on to say that the exclusive jurisdiction of the federal courts under, Section 78aa, Title 15, U. S. Code,[21] does not bar a plaintiff from pursuing at his option remedies based solely on state law.

---

[21]Section 78aa, Title 15, U. S. Code, states:

"The district courts of the United States, and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits

Similarly, the exclusive jurisdiction contained in Section 308 of the Packers and Stockyard Act, Section 209, Title 7, U. S. Code, has been held not to bar state remedies. In *Denver Union Stock Yard Co.* v. *Livak Meat Co.* (D. Colo. 1968), 205 F. Supp. 809, the court ruled that the defendant's claim that Sections 201, 302, 305, 307 and 308 of the Act, Sections 191, 202, 206, 208 and 209, Title 7, U. S. Code, which provide for extensive regulations of the packing and stockyard industry, does not convert an action founded on state law into one cognizable in a federal forum.

In addition to the Natural Gas Act, the Security Exchange Act and the Packers and Stockyard Act federal courts have recognized the co-existence of remedies based solely on state law even though there exists an extensive system of federal regulations in the Federal Food and Drug Act; *Clairol, Inc.,* v. *Suburban Cosmetic and Beauty Supply, Inc.* (N. D. Ill., E. D. 1968), 278 F. Supp. 859; National Labor Relations Act, *Association of Machinists* .v. *United Aircraft Supply* (2d Cir. 1964), 333 F. 2d 367; and federal bankruptcy laws, *Farmco Stores, Inc.* v. *Newmark* (E. D. Cal. 1970), 315 F. Supp. 396.[25]

in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder. Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or * * * wherever the defendant may be found. Judgments and decrees so rendered shall be subject to review as provided in sections 225 and 347 of Title 28. No costs shall be assessed for or against the Commission in any proceeding under this chapter brought by or against it in the Supreme Court or such other courts."

[25]All of the cases cited except for *Pan American* were removed to the federal courts by the defendants pursuant to Section 1441, Title 28, U. S. Code, and were on motion to remand to the state courts pursuant to Section 1447, Title 28, U. S. Code. In the instant case, although the City argued that the proper forum to decide the issues raised by CEI was in the federal courts, the record does not disclose

Consequently, we conclude that Section 317 of the Federal Power Act must be construed as are Section 22 of the Natural Gas Act and Section 27 of the Securities Exchange Act of 1934. These federal provisions do not bar a plaintiff from pursuing at his option remedies based solely on state law in state forums.

The first action in the case at bar is a suit to recover on a simple contract, the letter agreement. Under the Ohio Constitution, Section 4, Article IV, and R. C. 2505.01, the common pleas court has jurisdiction to adjudicate the rights and obligations of the parties under Ohio law without resort to the Federal Power Act or the rules, regulations or orders thereunder.

In the second action it is not immediately apparent whether a cause of action exists under Ohio law which will allow CEI to recover, as the record does not disclose that evidence was presented to the trial court on that issue. If a cause of action exists under the law of Ohio, CEI has a right to pursue it. Therefore, the trial court erred in dismissing the second action on the ground that it lacked jurisdiction. This case must be remanded to the trial court for a determination as to whether CEI has a remedy under Ohio law.

## II.

The court having jurisdiction, it must next decide whether to stay proceedings in the first action pending determination of matters before the Federal Power Commission[20] under the doctrine of primary administrative jurisdiction. The doctrine of primary administrative jurisdiction permits a court to avail itself of the expertise of an administrative agency having special competence in the matter at hand. As stated in *United States*

an attempt by the City to remove the action to the Federal District Court.

[20] As the United States Court of Appeals for the District of Columbia has affirmed FPC Order No. 644 in all matters except as to the rates to be charged prior to May 17, 1972, that issue is the only matter presently pending before the Commission, and it only effects the first action.

v. *Western Pacific Railroad Co.* (1956), 352 U. S. 59, 63-64, 1 L. Ed. 2d 126, 132:

"Primary jurisdiction * * * applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, *have been placed within the special competence of an administrative body;* in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views. *General American Tank Car Corp.* v. *El Dorado Terminal Co.,* 308 US 422, 433, 84 L ed 361, 370, 60 S. Ct. 325." (Emphasis added.)

The doctrine of primary administrative jurisdiction does not apply, however, in relation to a question which, while properly determinable by an administrative agency *does not involve a matter within the special expertise of the agency* such as a matter of law. *Opdykev* v. *Security Savings and Loan* (1950), 59 Ohio Law Abs. 212, *aff'd,* 59 Ohio Law Abs. 257 (1951), *aff'd,* 157 Ohio St. 121 (1952); *Eastern Shore Natural Gas Co.* v. *Stauffer Chemical Co.* (Del. S. Ct. 1972), 298 A. 2d 322.

In the case at bar the defenses raised by the City in the first action are not only matters of law and not within the special competence of the FPC, they are matters of Ohio law,[27] an area where the FPC would be at a severe disadvantage in interpretation. The FPC should defer its resolution of the matters before it in this case concerning the interpretation of Ohio law until the courts of Ohio have decided the issue, as the FPC must abide by the Ohio courts' decisions on Ohio law.

If the defenses raised by the City had put into issue some matter which required the special expertise of the FPC, such as an allegation that the rates to be charged are arbitrary or unreasonable, this court would be compelled, pursuant to the doctrine of primary administrative jur-

---

[27]The City alleges in its assignments of error II and III in Case No. 35002 that the letter agreement violates both the Cleveland City Charter and City Ordinance No. 161-70, *see* Sections IV and V, *infra.*

isdiction, to defer to that expertise. However, the courts of Ohio are the ultimate arbiters of Ohio law and the duties and obligations thereunder, and we recognize this responsibility to adjudicate the issues herein as they are founded principally upon Ohio law.

## III.

In its second assignment of error in Case No. 35002, the City of Cleveland contends that Cleveland Charter Sections 83, 106, 107 and 109 are applicable to a proper determination of the controversy in the first action.[28] The City never stated what it considers to be the effect of the applicability of these provisions. The City apparently urges that if the letter agreement was made in violation of these provisions of the charter the agreement is void.[29]

This is not the first time the City of Cleveland has raised these sections of the City Charter to protect itself from a contract to which it had previously agreed, and which does not involve the expenditure of tax revenues.[30] In *Walsh Construction Co.* v. *Cleveland* (N. D. Ohio, 1920), 271 F. 701, *aff'd,* 279 F. 57 (6th Cir. 1922), the District Court for the Northern District of Ohio was presented with the same alleged defenses. The court reasoned that these charter provisions were the counterparts of sections of the General Code of Ohio.[31] These General Code sections, having been in effect for many years, had acquired a well-settled construction. They were only to apply to those cases in which a contract was to be paid out of revenues raised by taxes, *e. g. Frisbie Company* v. *The City of Cleveland* (1918), 98 Ohio St. 267; *Emmert* v. *Elyria* (1906),

[28]The trial court had ruled that these City Charter provisions were inapplicable.

[29]These provisions of the Charter require a certificate of the Director of Finance specifying that sufficient funds are available before a contract on behalf of the City may be validly entered into.

[30]Although it is not specially stated in the letter agreement, it is apparent that the cost of the contract would come from the revenues of MELP and not the tax revenues of the City.

[31]Former G. C. 5625-33 and 5625-34, now R. C. 5705.41(D).

74 Ohio St. 185,[32] and do not apply to funds from a public utility.

The court in *Walsh* reasoned that by incorporating these Code sections into the Cleveland City Charter, the City intended no change of law and therefore also incorporated the settled construction. The court concluded that the cited provisions of the Cleveland City Charter did not void a contract made contrary to them as long as the contract does not involve the expenditures of tax revenues.

*Walsh* was followed by *Burt* v. *City of Cleveland* (1945), 76 Ohio App. 451. In *Burt* this court concluded that these provisions of the Cleveland Charter have no application where the contract involves the transit system and the funds to be expended were derived from the operating revenues of the system and not from taxation.

A similar result is dictated in the instant case. As the funds for the payment of the letter agreement were to be derived from the operating revenues of MELP and not from taxes, the City Charter provisions have no application. The City's assignment of error II in Case No. 35002 is overruled.[33]

## IV.

The City, in its final assignment of error in Case No. 35002, states that City Ordinance No. 161-70 is a valid ordinance and applicable to this action. There is nothing

---

[32]This construction of the Code was incorporated into the Revised Code in 1953, R. C. 5705.44.

[33]The City also alleges that the City Charter, Section 108, requiring bidding on all contracts in excess of five hundred dollars, voids the contract. This allegation is similarly without merit. A general exception is recognized to this bidding requirement, if a real and present danger exists in connection with the operation of a municipal public utility, R. C. 735.051. In the instant case the power outage that occurred during Christmas, 1969, presented a real and present danger. This was recognized by the Cleveland City Council in unanimously enacting Ordinance 161-70, as it does not require competitive bidding, but authorizes the Director of Public Utilities to enter into a contract with CEI without bidding, *cf.*, *Mutual Electric Co.* v. *Village of Pomeroy* (1918), 99 Ohio St. 75.

in the journal entry or in the record of the Common Pleas Court that can be construed as holding that Ordinance 161-70 is either invalid or inapplicable. The actual basis for this assignment of error appears to be that the rates contained within the ordinance differ from the rates contained in the letter agreement; hence, the City contends that the letter agreement is not a valid contract.[34]

Ordinance 161-70 specifies that "* * * CEI shall sell said power to the City at a rate not to exceed 30c a month per KVA demand, $0.0085 per KWH for 10 million KWH and $0.005 per KWH above 10 million." The letter agreement uses a different expression to calculate the rates:

"The rate for this service shall be as follows:

"Contract Demand Charge—
For each KVA of Contract Demand per
month per KVA ...........................$0.30
"Energy Charge—
For the first 400 KWH per KVA of
Contract Demand per KWH ................$0.0085
"For all additional KWH ..................$0.005

"The City and the Company shall jointly determine the KVA capacity to be made available at each point of connection and the Contract Demand shall be the sum of such jointly determined loads to be supplied. The loads to be supplied initially at each of the locations shall be:

"1. Collinwood—10,000 KVA;
"2. Arctic—3,125 KVA;
"3. Denison—3,125 KVA;
"4. Clinton—3,125 KVA; and
"5. Western—6,000 KVA.

"The initial Contract Demand is 25,375 KVA."

As can be seen the rate to be charged the City in both the ordinance and the letter agreement is a two-tiered rate structure—the first component being a demand charge and the second, an energy charge. The demand charge is com-

---

[34]The City argues that the Director of Public Utilities is a mere agent of the City and cannot bind the City to a contract beyond his actual authority as given him by the City Council.

puted by determining the demand, measured in KVA[35] and multiplying that amount by the rate per KVA.[36] The energy charge is determined by ascertaining the energy drawn over a billing period in KWH[37] and multiplying that by the appropriate rate per KWH.[38]

The City contends that the components of the rate contained in the letter agreement are different from the components of the rate in the Ordinance. In the demand charge portion of the rate the City states that the presence of a rachet clause[39] in the letter agreement not included in the City ordinance voids that term of the agreement.

The effect of the rachet was that each time the City consumed more energy than specified in the letter agreement[40] the contract demand[41] is increased to that amount and is never reduced, even if subsequent demand is reduced.

The City urges this court to construe the term "demand" in the City ordinance not as the contract demand but as the actual demand, that is, the amount actually

---

[35]A KVA or kilovolt ampere is equivalent to a kilowatt or one thousand watts.

[36]Thirty cents in both the ordinance and the letter agreement.

[37]A KWH or kilowatt hour is the equivalent of one KVA drawn for one hour.

[38]In the ordinance, $0.0085 per KWH for the first 10 million KWH and $0.005 per KWH thereafter. In the letter agreement, $0.0085 per KWH for the first 400 KWH per contract demand, and $0.005 per KWH thereafter.

[39]The rachet clause states:

"The Contract Demand shall be increased or decreased as appropriate when points of connection are added or removed. If the load supplied at any point of connection exceeds the amount specified and agreed upon, the Contract Demand shall be increased thereupon by the amount of such excess. The Contract Demand shall not be changed other than through the operation of the two preceding sentences."

[40]The ordinance did not specify any demand load. It appears to leave the amount of load to be purchased to the discretion of the Director of Public Utilities.

[41]The contract demand is the amount of power contracted for in the letter agreement. This amount is increased by the rachet.

294

used by the City. The difficulty with the interpretation by the City of its ordinance is that CEI is not paid for energy which it must keep in reserve but which is not used by the City.

When a power company agrees to sell energy to a customer, it must be aware of the maximum load that the customer will put on its system, so that if the customer draws this maximum load the company will not experience a power outage. In other words, at any instant in time the company must keep in reserve an amount of power equal to the maximum load that may be drawn, less the actual load drawn at that instant.[42]

It is not rational to assume that the City Council would intend that CEI not be compensated for this power kept in reserve. Such interpretation encompasses the rachet, for as CEI was required to maintain greater amounts of power in reserve, the amount of its compensation for that reserve power would increase. The only reasonable interpretation of the term "demand," as used in the ordinance, is the amount called for or required by the contract—the contract demand.

That this interpretation was intended by City Council is further demonstrated by an understanding of the circumstances surrounding the enactment of the ordinance. An ordinance, such as this one, which is ambiguous, must be interpreted in light of the circumstances under which it was enacted, *Kitchen* v. *Duffield* (1947), 83 Ohio App. 41. *aff'd.* 149 Ohio St. 500, *cf.*, R. C. 1.49(B).

Lee C. Howley, vice-president and general counsel of CEI testified as to those circumstances: after the Christmas, 1969 outage officials from the City, including the Mayor, Director of Public Utilities and MELP engineers, met with representative of CEI, including Mr. Howley. At this meeting the parties developed a basic understanding for the interconnection between the two systems. As a result of this arrangement, the City Council repealed Ordin-

[42]Testimony of William N. Bingham, Principal Rate Engineer for CEI.

ance 115-70 by enacting Ordinance 161-70 which authorized the Director of Public Utilities to enter into this agreement. This action was taken by the City Council to legislatively effectuate the understanding reached by the parties on this matter.

The ordinance was a response to the agreement and a reasonable interpretation that the intent of City Council was to ratify the agreement between officials of CEI and MELP. As the City was attempting to ratify this understanding, the terms of the ordinance should be interpreted so as to effectuate that purpose, *State, ex rel. Grant, v. Kiefaber* (1960), 114 Ohio App. 279, *aff'd,* 171 Ohio St. 326 (1960).

Under these circumstances, this can only lead to interpreting the term "demand" in the ordinance as the "contract demand" in the letter agreement.[43]

We find the third assignment of error by the City in Case No. 35002 without merit.

## V.

In the first action we hold that the trial court correctly concluded that pursuant to Ohio law a cause of action exists against the City for its breach of the letter agreement, and that such cause of action is justiciable in Ohio courts. The court also was correct in holding that the letter agreement is not in conflict with either the specified sections of the Cleveland Charter or Ordinance 161-70.

In the second action we hold that the court had jurisdiction to adjudicate the rights of the parties under Ohio law. Consequently, the court below erred in dismissing

---

[43]The City's contention that the rate per KWH in the energy charge contained in the ordinance should be interpreted so as to void the term in the letter agreement, can be similarly disposed of. While it is readily apparent that the rate per KWH formulation in the letter agreement differs from that in the ordinance, it is not clear if the rate is less than that of the ordinance or greater than it. An examination of the testimony of William N. Bingham, Principal Rate Engineer for CEI, demonstrates that the rate in the letter agreement is less than the rate in the ordinance when the term "ten million KWH" in the ordinance is construed to refer to the amount used at each substation.

the action without inquiring into whether the complaint of CEI set forth a cause of action under state law. We express no opinion as to whether such a cause of action exists, but CEI should be allowed the opportunity to demonstrate its contention.

Accordingly, the decision of the trial court in Case No. 35002 is affirmed, and the decision in Case No. 34959 is reversed and remanded for further proceeding according to law.

*Judgment accordingly.*

CORRIGAN, J., concurs. PARRINO, J., concurs in part and dissents in part.

PARRINO, J., concurring in part and dissenting in part. I concur with the decision of this court in Case No. 35002 for the reasons stated in our opinion.

However, I dissent from the majority opinion in Case No. 34959 because the complaint clearly indicates that plaintiff-appellant's action in that case does not seek to enforce a contract which would be cognizable in a state court,[44] but rather seeks to collect money owed appellant because of an order of the Federal Power Commission.[45] Such claim, in my opinion, may be brought only in federal district court. Section 825P, Title 16, U. S. Code.[46]

For these reasons, it is my opinion that the trial court was fully justified in granting defendant-appellee's motion to dismiss plaintiff-appellant's action in Case No. 34959 for lack of jurisdiction.

In Case No. 34959 I affirm.

---

[44]*Pan American Petroleum Corp.* v. *Superior Court of Delaware* (1961), 366 U. S. 656, 6 L. Ed. 2d 584.

[45]Opinion No. 644 of the Federal Power Commission entered January 11, 1973 which established a rate for power supplied to the City of Cleveland after May 17, 1972 by the Cleveland Electric Illuminating Co.

[46]The District Courts of the United States, and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules, regulations, and orders thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of, this chapter or any rule, regulation, or order thereunder.